(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TOWN OF GREECE, NEW YORK *v.* GALLOWAY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 12–696. Argued November 6, 2013—Decided May 5, 2014

Since 1999, the monthly town board meetings in Greece, New York, have opened with a roll call, a recitation of the Pledge of Allegiance, and a prayer given by clergy selected from the congregations listed in a local directory. While the prayer program is open to all creeds, nearly all of the local congregations are Christian; thus, nearly all of the participating prayer givers have been too. Respondents, citizens who attend meetings to speak on local issues, filed suit, alleging that the town violated the First Amendment's Establishment Clause by preferring Christians over other prayer givers and by sponsoring sectarian prayers. They sought to limit the town to "inclusive and ecumenical" prayers that referred only to a "generic God." The District Court upheld the prayer practice on summary judgment, finding no impermissible preference for Christianity; concluding that the Christian identity of most of the prayer givers reflected the predominantly Christian character of the town's congregations, not an official policy or practice of discriminating against minority faiths; finding that the First Amendment did not require Greece to invite clergy from congregations beyond its borders to achieve religious diversity; and rejecting the theory that legislative prayer must be nonsectarian. The Second Circuit reversed, holding that some aspects of the prayer program, viewed in their totality by a reasonable observer, conveyed the message that Greece was endorsing Christianity.

*Held:* The judgment is reversed.

681 F. 3d 20, reversed.

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part II–B, concluding that the town's prayer practice does not violate the Establishment Clause. Pp. 6–18.

Syllabus

(a) Legislative prayer, while religious in nature, has long been understood as compatible with the Establishment Clause. *Marsh* v. *Chambers*, 463 U. S. 783, 792. In *Marsh*, the Court concluded that it was not necessary to define the Establishment Clause's precise boundary in order to uphold Nebraska's practice of employing a legislative chaplain because history supported the conclusion that the specific practice was permitted. The First Congress voted to appoint and pay official chaplains shortly after approving language for the First Amendment, and both Houses have maintained the office virtually uninterrupted since then. See *id.*, at 787–789, and n. 10. A majority of the States have also had a consistent practice of legislative prayer. *Id.,* at 788–790, and n. 11. There is historical precedent for the practice of opening local legislative meetings with prayer as well. *Marsh* teaches that the Establishment Clause must be interpreted "by reference to historical practices and understandings." *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 670 (opinion of KENNEDY, J.). Thus, any test must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change. The Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures. Pp. 6–9.

(b) Respondents' insistence on nonsectarian prayer is not consistent with this tradition. The prayers in *Marsh* were consistent with the First Amendment not because they espoused only a generic theism but because the Nation's history and tradition have shown that prayer in this limited context could "coexis[t] with the principles of disestablishment and religious freedom." 463 U. S., at 786. Dictum in *County of Allegheny* suggesting that *Marsh* permitted only prayer with no overtly Christian references is irreconcilable with the facts, holding, and reasoning of *Marsh*, which instructed that the "content of the prayer is not of concern to judges," provided "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." 463 U. S., at 794–795. To hold that invocations must be nonsectarian would force the legislatures sponsoring prayers and the courts deciding these cases to act as supervisors and censors of religious speech, thus involving government in religious matters to a far greater degree than is the case under the town's current practice of neither editing nor approving prayers in advance nor criticizing their content after the fact. Respondents' contrary arguments are unpersuasive. It is doubtful that consensus could be reached as to what qualifies as a generic or nonsectarian prayer. It would also be unwise to conclude that only those religious words acceptable to the majority are permis-

sible, for the First Amendment is not a majority rule and government
may not seek to define permissible categories of religious speech.  In
rejecting the suggestion that legislative prayer must be nonsectarian,
the Court does not imply that no constraints remain on its content.
The relevant constraint derives from the prayer's place at the open-
ing of legislative sessions, where it is meant to lend gravity to the oc-
casion and reflect values long part of the Nation's heritage.  From the
Nation's earliest days, invocations have been addressed to assemblies
comprising many different creeds, striving for the idea that people of
many faiths may be united in a community of tolerance and devotion,
even if they disagree as to religious doctrine.  The prayers delivered
in Greece do not fall outside this tradition.  They may have invoked,
*e.g.,* the name of Jesus, but they also invoked universal themes, *e.g.,*
by calling for a "spirit of cooperation."  Absent a pattern of prayers
that over time denigrate, proselytize, or betray an impermissible gov-
ernment purpose, a challenge based solely on the content of a par-
ticular prayer will not likely establish a constitutional violation.  See
463 U. S., at 794–795.  Finally, so long as the town maintains a policy
of nondiscrimination, the Constitution does not require it to search
beyond its borders for non-Christian prayer givers in an effort to
achieve religious balancing.  Pp. 9–18.

   JUSTICE KENNEDY, joined by THE CHIEF JUSTICE and JUSTICE ALITO,
concluded in Part II–B that a fact-sensitive inquiry that considers
both the setting in which the prayer arises and the audience to whom
it is directed shows that the town is not coercing its citizens to engage
in a religious observance.  The prayer opportunity is evaluated
against the backdrop of a historical practice showing that prayer has
become part of the Nation's heritage and tradition.  It is presumed
that the reasonable observer is acquainted with this tradition and
understands that its purposes are to lend gravity to public proceed-
ings and to acknowledge the place religion holds in the lives of many
private citizens.  Furthermore, the principal audience for these invo-
cations is not the public, but the lawmakers themselves.  And those
lawmakers did not direct the public to participate, single out dissi-
dents for opprobrium, or indicate that their decisions might be influ-
enced by a person's acquiescence in the prayer opportunity.  Re-
spondents claim that the prayers gave them offense and made them
feel excluded and disrespected, but offense does not equate to coer-
cion.  In contrast to *Lee* v. *Weisman*, 505 U. S. 577, where the Court
found coercive a religious invocation at a high school graduation, *id.,*
at 592–594, the record here does not suggest that citizens are dis-
suaded from leaving the meeting room during the prayer, arriving
late, or making a later protest.  That the prayer in Greece is deliv-
ered during the opening ceremonial portion of the town's meeting, not

Syllabus

the policymaking portion, also suggests that its purpose and effect are to acknowledge religious leaders and their institutions, not to exclude or coerce nonbelievers. Pp. 18–23.

JUSTICE THOMAS, joined by JUSTICE SCALIA as to Part II, agreed that the town's prayer practice does not violate the Establishment Clause, but concluded that, even if the Establishment Clause were properly incorporated against the States through the Fourteenth Amendment, the Clause is not violated by the kind of subtle pressures respondents allegedly suffered, which do not amount to actual legal coercion. The municipal prayers in this case bear no resemblance to the coercive state establishments that existed at the founding, which exercised government power in order to exact financial support of the church, compel religious observance, or control religious doctrine. Pp. 1–8.

KENNEDY, J., delivered the opinion of the Court, except as to Part II–B. ROBERTS, C. J., and ALITO, J., joined the opinion in full, and SCALIA and THOMAS, JJ., joined except as to Part II–B. ALITO, J., filed a concurring opinion, in which SCALIA, J., joined. THOMAS, J., filed an opinion concurring in part and concurring in the judgment, in which SCALIA, J., joined as to Part II. BREYER, J., filed a dissenting opinion. KAGAN, J., filed a dissenting opinion, in which GINSBURG, BREYER, and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–696

_____

## TOWN OF GREECE, NEW YORK, PETITIONER *v.* SUSAN GALLOWAY ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[May 5, 2014]

JUSTICE KENNEDY delivered the opinion of the Court, except as to Part II–B.*

The Court must decide whether the town of Greece, New York, imposes an impermissible establishment of religion by opening its monthly board meetings with a prayer. It must be concluded, consistent with the Court's opinion in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), that no violation of the Constitution has been shown.

I

Greece, a town with a population of 94,000, is in upstate New York. For some years, it began its monthly town board meetings with a moment of silence. In 1999, the newly elected town supervisor, John Auberger, decided to replicate the prayer practice he had found meaningful while serving in the county legislature. Following the roll call and recitation of the Pledge of Allegiance, Auberger would invite a local clergyman to the front of the room to deliver an invocation. After the prayer, Auberger would

_____

*THE CHIEF JUSTICE and JUSTICE ALITO join this opinion in full. JUSTICE SCALIA and JUSTICE THOMAS join this opinion except as to Part II–B.

thank the minister for serving as the board's "chaplain for the month" and present him with a commemorative plaque.  The prayer was intended to place town board members in a solemn and deliberative frame of mind, invoke divine guidance in town affairs, and follow a tradition practiced by Congress and dozens of state legislatures.  App. 22a–25a.

The town followed an informal method for selecting prayer givers, all of whom were unpaid volunteers.  A town employee would call the congregations listed in a local directory until she found a minister available for that month's meeting.  The town eventually compiled a list of willing "board chaplains" who had accepted invitations and agreed to return in the future.  The town at no point excluded or denied an opportunity to a would-be prayer giver.  Its leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation.  But nearly all of the congregations in town were Christian; and from 1999 to 2007, all of the participating ministers were too.

Greece neither reviewed the prayers in advance of the meetings nor provided guidance as to their tone or content, in the belief that exercising any degree of control over the prayers would infringe both the free exercise and speech rights of the ministers.  *Id.*, at 22a.  The town instead left the guest clergy free to compose their own devotions.  The resulting prayers often sounded both civic and religious themes.  Typical were invocations that asked the divinity to abide at the meeting and bestow blessings on the community:

> "Lord we ask you to send your spirit of servanthood upon all of us gathered here this evening to do your work for the benefit of all in our community.  We ask you to bless our elected and appointed officials so they may deliberate with wisdom and act with courage.  Bless the members of our community who come here

to speak before the board so they may state their cause with honesty and humility. . . . Lord we ask you to bless us all, that everything we do here tonight will move you to welcome us one day into your kingdom as good and faithful servants. We ask this in the name of our brother Jesus. Amen." *Id.,* at 45a.

Some of the ministers spoke in a distinctly Christian idiom; and a minority invoked religious holidays, scripture, or doctrine, as in the following prayer:

"Lord, God of all creation, we give you thanks and praise for your presence and action in the world. We look with anticipation to the celebration of Holy Week and Easter. It is in the solemn events of next week that we find the very heart and center of our Christian faith. We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength, vitality, and confidence from his resurrection at Easter. . . . We pray for peace in the world, an end to terrorism, violence, conflict, and war. We pray for stability, democracy, and good government in those countries in which our armed forces are now serving, especially in Iraq and Afghanistan. . . . Praise and glory be yours, O Lord, now and forever more. Amen." *Id.,* at 88a–89a.

Respondents Susan Galloway and Linda Stephens attended town board meetings to speak about issues of local concern, and they objected that the prayers violated their religious or philosophical views. At one meeting, Galloway admonished board members that she found the prayers "offensive," "intolerable," and an affront to a "diverse community." Complaint in No. 08–cv–6088 (WDNY), ¶66. After respondents complained that Christian themes pervaded the prayers, to the exclusion of citizens who did not share those beliefs, the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver prayers. A Wiccan priestess who had read

press reports about the prayer controversy requested, and
was granted, an opportunity to give the invocation.

Galloway and Stephens brought suit in the United
States District Court for the Western District of New
York.  They alleged that the town violated the First
Amendment's Establishment Clause by preferring Chris-
tians over other prayer givers and by sponsoring sectarian
prayers, such as those given "in Jesus' name."   732
F. Supp. 2d 195, 203 (2010).  They did not seek an end to
the prayer practice, but rather requested an injunction
that would limit the town to "inclusive and ecumenical"
prayers that referred only to a "generic God" and would
not associate the government with any one faith or belief.
*Id.,* at 210, 241.

The District Court on summary judgment upheld the
prayer practice as consistent with the First Amendment.
It found no impermissible preference for Christianity,
noting that the town had opened the prayer program to all
creeds and excluded none.  Although most of the prayer
givers were Christian, this fact reflected only the predom-
inantly Christian identity of the town's congregations,
rather than an official policy or practice of discriminating
against minority faiths.  The District Court found no
authority for the proposition that the First Amendment
required Greece to invite clergy from congregations be-
yond its borders in order to achieve a minimum level of
religious diversity.

The District Court also rejected the theory that legisla-
tive prayer must be nonsectarian.  The court began its
inquiry with the opinion in *Marsh* v. *Chambers*, 463 U. S.
783, which permitted prayer in state legislatures by a
chaplain paid from the public purse, so long as the prayer
opportunity was not "exploited to proselytize or advance
any one, or to disparage any other, faith or belief," *id.,* at
794–795.  With respect to the prayer in Greece, the Dis-
trict Court concluded that references to Jesus, and the
occasional request that the audience stand for the prayer,

did not amount to impermissible proselytizing. It located in *Marsh* no additional requirement that the prayers be purged of sectarian content. In this regard the court quoted recent invocations offered in the U. S. House of Representatives "in the name of our Lord Jesus Christ," *e.g.*, 156 Cong Rec. H5205 (June 30, 2010), and situated prayer in this context as part a long tradition. Finally, the trial court noted this Court's statement in *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 603 (1989), that the prayers in *Marsh* did not offend the Establishment Clause "because the particular chaplain had 'removed all references to Christ.'" But the District Court did not read that statement to mandate that legislative prayer be nonsectarian, at least in circumstances where the town permitted clergy from a variety of faiths to give invocations. By welcoming many viewpoints, the District Court concluded, the town would be unlikely to give the impression that it was affiliating itself with any one religion.

The Court of Appeals for the Second Circuit reversed. 681 F. 3d 20, 34 (2012). It held that some aspects of the prayer program, viewed in their totality by a reasonable observer, conveyed the message that Greece was endorsing Christianity. The town's failure to promote the prayer opportunity to the public, or to invite ministers from congregations outside the town limits, all but "ensured a Christian viewpoint." *Id.,* at 30–31. Although the court found no inherent problem in the sectarian content of the prayers, it concluded that the "steady drumbeat" of Christian prayer, unbroken by invocations from other faith traditions, tended to affiliate the town with Christianity. *Id.,* at 32. Finally, the court found it relevant that guest clergy sometimes spoke on behalf of all present at the meeting, as by saying "let us pray," or by asking audience members to stand and bow their heads: "The invitation . . . to participate in the prayer . . . placed audience members

who are nonreligious or adherents of non-Christian reli-
gion in the awkward position of either participating in
prayers invoking beliefs they did not share or appearing to
show disrespect for the invocation." *Ibid.* That board
members bowed their heads or made the sign of the cross
further conveyed the message that the town endorsed
Christianity. The Court of Appeals emphasized that it
was the "interaction of the facts present in this case,"
rather than any single element, that rendered the prayer
unconstitutional. *Id.,* at 33.

Having granted certiorari to decide whether the town's
prayer practice violates the Establishment Clause, 569
U. S. ___ (2013), the Court now reverses the judgment of
the Court of Appeals.

## II

In *Marsh* v. *Chambers*, 463 U. S. 783, the Court found
no First Amendment violation in the Nebraska Legisla-
ture's practice of opening its sessions with a prayer deliv-
ered by a chaplain paid from state funds. The decision
concluded that legislative prayer, while religious in na-
ture, has long been understood as compatible with the
Establishment Clause. As practiced by Congress since the
framing of the Constitution, legislative prayer lends grav-
ity to public business, reminds lawmakers to transcend
petty differences in pursuit of a higher purpose, and ex-
presses a common aspiration to a just and peaceful soci-
ety. See *Lynch* v. *Donnelly*, 465 U. S. 668, 693 (1984)
(O'Connor, J., concurring); cf. A. Adams & C. Emmerich, A
Nation Dedicated to Religious Liberty 83 (1990). The
Court has considered this symbolic expression to be a
"tolerable acknowledgement of beliefs widely held," *Marsh*,
463 U. S., at 792, rather than a first, treacherous step
towards establishment of a state church.

*Marsh* is sometimes described as "carving out an excep-
tion" to the Court's Establishment Clause jurisprudence,

because it sustained legislative prayer without subjecting the practice to "any of the formal 'tests' that have traditionally structured" this inquiry. *Id.*, at 796, 813 (Brennan, J., dissenting). The Court in *Marsh* found those tests unnecessary because history supported the conclusion that legislative invocations are compatible with the Establishment Clause. The First Congress made it an early item of business to appoint and pay official chaplains, and both the House and Senate have maintained the office virtually uninterrupted since that time. See *id.*, at 787–789, and n. 10; N. Feldman, Divided by God 109 (2005). But see *Marsh, supra*, at 791–792, and n. 12 (noting dissenting views among the Framers); Madison, "Detached Memoranda", 3 Wm. & Mary Quarterly 534, 558–559 (1946) (hereinafter Madison's Detached Memoranda). When *Marsh* was decided, in 1983, legislative prayer had persisted in the Nebraska Legislature for more than a century, and the majority of the other States also had the same, consistent practice. 463 U. S., at 788–790, and n. 11. Although no information has been cited by the parties to indicate how many local legislative bodies open their meetings with prayer, this practice too has historical precedent. See Reports of Proceedings of the City Council of Boston for the Year Commencing Jan. 1, 1909, and Ending Feb. 5, 1910, pp. 1–2 (1910) (Rev. Arthur Little) ("And now we desire to invoke Thy presence, Thy blessing, and Thy guidance upon those who are gathered here this morning . . ."). "In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with a prayer has become part of the fabric of our society." *Marsh, supra*, at 792.

Yet *Marsh* must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation. The case teaches instead that the Establishment Clause must be interpreted "by

reference to historical practices and understandings." *County of Allegheny*, 492 U. S., at 670 (KENNEDY, J., concurring in judgment in part and dissenting in part). That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered legislative prayer a benign acknowledgment of religion's role in society. D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, pp. 12–13 (1997). In the 1850's, the judiciary committees in both the House and Senate reevaluated the practice of official chaplaincies after receiving petitions to abolish the office. The committees concluded that the office posed no threat of an establishment because lawmakers were not compelled to attend the daily prayer, S. Rep. No. 376, 32d Cong., 2d Sess., 2 (1853); no faith was excluded by law, nor any favored, *id.*, at 3; and the cost of the chaplain's salary imposed a vanishingly small burden on taxpayers, H. Rep. No. 124, 33d Cong., 1st Sess., 6 (1854). *Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change. *County of Allegheny*, *supra,* at 670 (opinion of KENNEDY, J.); see also *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 294 (1963) (Brennan, J., concurring) ("[T]he line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers"). A test that would sweep away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent. See *Van Orden* v. *Perry*, 545 U. S. 677, 702–704 (2005) (BREYER, J., concurring in judgment).

The Court's inquiry, then, must be to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures. Respondents assert that the town's prayer exercise falls outside that tradition and transgresses the Establishment Clause for two independent but mutually reinforcing reasons. First, they argue that *Marsh* did not approve prayers containing sectarian language or themes, such as the prayers offered in Greece that referred to the "death, resurrection, and ascension of the Savior Jesus Christ," App. 129a, and the "saving sacrifice of Jesus Christ on the cross," *id.*, at 88a. Second, they argue that the setting and conduct of the town board meetings create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board. The sectarian content of the prayers compounds the subtle coercive pressures, they argue, because the nonbeliever who might tolerate ecumenical prayer is forced to do the same for prayer that might be inimical to his or her beliefs.

A

Respondents maintain that prayer must be nonsectarian, or not identifiable with any one religion; and they fault the town for permitting guest chaplains to deliver prayers that "use overtly Christian terms" or "invoke specifics of Christian theology." Brief for Respondents 20. A prayer is fitting for the public sphere, in their view, only if it contains the '"most general, nonsectarian reference to God,'" *id.,* at 33 (quoting M. Meyerson, Endowed by Our Creator: The Birth of Religious Freedom in America 11–12 (2012)), and eschews mention of doctrines associated with any one faith, Brief for Respondents 32–33. They argue that prayer which contemplates "the workings of the Holy Spirit, the events of Pentecost, and the belief that God 'has raised

up the Lord Jesus' and 'will raise us, in our turn, and put
us by His side'" would be impermissible, as would any
prayer that reflects dogma particular to a single faith
tradition. *Id.*, at 34 (quoting App. 89a and citing *id.,* at
56a, 123a, 134a).

An insistence on nonsectarian or ecumenical prayer as a
single, fixed standard is not consistent with the tradition
of legislative prayer outlined in the Court's cases. The
Court found the prayers in *Marsh* consistent with the
First Amendment not because they espoused only a ge-
neric theism but because our history and tradition have
shown that prayer in this limited context could "coexis[t]
with the principles of disestablishment and religious
freedom." 463 U. S., at 786. The Congress that drafted
the First Amendment would have been accustomed to
invocations containing explicitly religious themes of the
sort respondents find objectionable. One of the Senate's
first chaplains, the Rev. William White, gave prayers in a
series that included the Lord's Prayer, the Collect for
Ash Wednesday, prayers for peace and grace, a general
thanksgiving, St. Chrysostom's Prayer, and a prayer
seeking "the grace of our Lord Jesus Christ, &c." Letter
from W. White to H. Jones (Dec. 29, 1830), in B. Wilson,
Memoir of the Life of the Right Reverend William White,
D. D., Bishop of the Protestant Episcopal Church in the
State of Pennsylvania 322 (1839); see also New Hampshire
Patriot & State Gazette, Dec. 15, 1823, p. 1 (describing a
Senate prayer addressing the "Throne of Grace"); Cong.
Globe, 37th Cong., 1st Sess., 2 (1861) (reciting the Lord's
Prayer). The decidedly Christian nature of these prayers
must not be dismissed as the relic of a time when our
Nation was less pluralistic than it is today. Congress
continues to permit its appointed and visiting chaplains to
express themselves in a religious idiom. It acknowledges
our growing diversity not by proscribing sectarian content
but by welcoming ministers of many creeds. See, *e.g.*, 160

Cong. Rec. S1329 (Mar. 6, 2014) (Dalai Lama) ("I am a Buddhist monk—a simple Buddhist monk—so we pray to Buddha and all other Gods"); 159 Cong. Rec. H7006 (Nov. 13, 2013) (Rabbi Joshua Gruenberg) ("Our God and God of our ancestors, Everlasting Spirit of the Universe . . ."); 159 Cong. Rec. H3024 (June 4, 2013) (Satguru Bodhinatha Veylanswami) ("Hindu scripture declares, without equivocation, that the highest of high ideals is to never knowingly harm anyone"); 158 Cong. Rec. H5633 (Aug. 2, 2012) (Imam Nayyar Imam) ("The final prophet of God, Muhammad, peace be upon him, stated: 'The leaders of a people are a representation of their deeds'").

The contention that legislative prayer must be generic or nonsectarian derives from dictum in *County of Allegheny*, 492 U. S. 573, that was disputed when written and has been repudiated by later cases. There the Court held that a crèche placed on the steps of a county courthouse to celebrate the Christmas season violated the Establishment Clause because it had "the effect of endorsing a patently Christian message." *Id.*, at 601. Four dissenting Justices disputed that endorsement could be the proper test, as it likely would condemn a host of traditional practices that recognize the role religion plays in our society, among them legislative prayer and the "forthrightly religious" Thanksgiving proclamations issued by nearly every President since Washington. *Id.*, at 670–671. The Court sought to counter this criticism by recasting *Marsh* to permit only prayer that contained no overtly Christian references:

"However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed . . . . The legislative prayers involved in *Marsh* did not violate this principle because the particular

chaplain had 'removed all references to Christ.'"  *Id.*,
at 603 (quoting *Marsh*, *supra*, at 793, n. 14; footnote
omitted).

This proposition is irreconcilable with the facts of *Marsh*
and with its holding and reasoning.  *Marsh* nowhere sug-
gested that the constitutionality of legislative prayer turns
on the neutrality of its content.  The opinion noted that
Nebraska's chaplain, the Rev. Robert E. Palmer, modu-
lated the "explicitly Christian" nature of his prayer and
"removed all references to Christ" after a Jewish law-
maker complained.  463 U. S., at 793, n. 14.  With this foot-
note, the Court did no more than observe the practical
demands placed on a minister who holds a permanent,
appointed position in a legislature and chooses to write his
or her prayers to appeal to more members, or at least to
give less offense to those who object.  See Mallory, "An
Officer of the House Which Chooses Him, and Nothing
More": How Should *Marsh* v. *Chambers* Apply to Rotating
Chaplains?, 73 U. Chi. L. Rev. 1421, 1445 (2006).  *Marsh*
did not suggest that Nebraska's prayer practice would
have failed had the chaplain not acceded to the legislator's
request.  Nor did the Court imply the rule that prayer
violates the Establishment Clause any time it is given in
the name of a figure deified by only one faith or creed.  See
*Van Orden*, 545 U. S., at 688, n. 8 (recognizing that the
prayers in *Marsh* were "often explicitly Christian" and
rejecting the view that this gave rise to an establishment
violation).  To the contrary, the Court instructed that the
"content of the prayer is not of concern to judges," provided
"there is no indication that the prayer opportunity has
been exploited to proselytize or advance any one, or to
disparage any other, faith or belief."  463 U. S., at 794–
795.

To hold that invocations must be nonsectarian would
force the legislatures that sponsor prayers and the courts

that are asked to decide these cases to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact. Cf. *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. ___, ___ (2012) (slip op., at 13–14). Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior. *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962). It would be but a few steps removed from that prohibition for legislatures to require chaplains to redact the religious content from their message in order to make it acceptable for the public sphere. Government may not mandate a civic religion that stifles any but the most generic reference to the sacred any more than it may prescribe a religious orthodoxy. See *Lee* v. *Weisman*, 505 U. S. 577, 590 (1992) ("The suggestion that government may establish an official or civic religion as a means of avoiding the establishment of a religion with more specific creeds strikes us as a contradiction that cannot be accepted"); *Schempp*, 374 U. S., at 306 (Goldberg, J., concurring) (arguing that "untutored devotion to the concept of neutrality" must not lead to "a brooding and pervasive devotion to the secular").

Respondents argue, in effect, that legislative prayer may be addressed only to a generic God. The law and the Court could not draw this line for each specific prayer or seek to require ministers to set aside their nuanced and deeply personal beliefs for vague and artificial ones. There is doubt, in any event, that consensus might be reached as to what qualifies as generic or nonsectarian. Honorifics like "Lord of Lords" or "King of Kings" might strike a Christian audience as ecumenical, yet these titles may have no place in the vocabulary of other faith tradi-

tions. The difficulty, indeed the futility, of sifting sectarian from nonsectarian speech is illustrated by a letter that a lawyer for the respondents sent the town in the early stages of this litigation. The letter opined that references to "Father, God, Lord God, and the Almighty" would be acceptable in public prayer, but that references to "Jesus Christ, the Holy Spirit, and the Holy Trinity" would not. App. 21a. Perhaps the writer believed the former grouping would be acceptable to monotheists. Yet even seemingly general references to God or the Father might alienate nonbelievers or polytheists. *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 893 (2005) (SCALIA, J., dissenting). Because it is unlikely that prayer will be inclusive beyond dispute, it would be unwise to adopt what respondents think is the next-best option: permitting those religious words, and only those words, that are acceptable to the majority, even if they will exclude some. *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961). The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech. Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian.

In rejecting the suggestion that legislative prayer must be nonsectarian, the Court does not imply that no constraints remain on its content. The relevant constraint derives from its place at the opening of legislative sessions, where it is meant to lend gravity to the occasion and reflect values long part of the Nation's heritage. Prayer that is solemn and respectful in tone, that invites lawmakers to reflect upon shared ideals and common ends before they embark on the fractious business of governing, serves that legitimate function. If the course and practice over time shows that the invocations denigrate nonbeliev-

ers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and to unite lawmakers in their common effort. That circumstance would present a different case than the one presently before the Court.

The tradition reflected in *Marsh* permits chaplains to ask their own God for blessings of peace, justice, and freedom that find appreciation among people of all faiths. That a prayer is given in the name of Jesus, Allah, or Jehovah, or that it makes passing reference to religious doctrines, does not remove it from that tradition. These religious themes provide particular means to universal ends. Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not "exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U. S., at 794–795.

It is thus possible to discern in the prayers offered to Congress a commonality of theme and tone. While these prayers vary in their degree of religiosity, they often seek peace for the Nation, wisdom for its lawmakers, and justice for its people, values that count as universal and that are embodied not only in religious traditions, but in our founding documents and laws. The first prayer delivered to the Continental Congress by the Rev. Jacob Duché on Sept. 7, 1774, provides an example:

> "Be Thou present O God of Wisdom and direct the counsel of this Honorable Assembly; enable them to settle all things on the best and surest foundations; that the scene of blood may be speedily closed; that Order, Harmony, and Peace be effectually restored, and the Truth and Justice, Religion and Piety, prevail and flourish among the people.
>
> "Preserve the health of their bodies, and the vigor of

their minds, shower down on them, and the millions they here represent, such temporal Blessings as Thou seest expedient for them in this world, and crown them with everlasting Glory in the world to come. All this we ask in the name and through the merits of Jesus Christ, Thy Son and our Saviour, Amen." W. Federer, America's God and Country 137 (2000).

From the earliest days of the Nation, these invocations have been addressed to assemblies comprising many different creeds. These ceremonial prayers strive for the idea that people of many faiths may be united in a community of tolerance and devotion. Even those who disagree as to religious doctrine may find common ground in the desire to show respect for the divine in all aspects of their lives and being. Our tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith. See Letter from John Adams to Abigail Adams (Sept. 16, 1774), in C. Adams, Familiar Letters of John Adams and His Wife Abigail Adams, During the Revolution 37–38 (1876).

The prayers delivered in the town of Greece do not fall outside the tradition this Court has recognized. A number of the prayers did invoke the name of Jesus, the Heavenly Father, or the Holy Spirit, but they also invoked universal themes, as by celebrating the changing of the seasons or calling for a "spirit of cooperation" among town leaders. App. 31a, 38a. Among numerous examples of such prayer in the record is the invocation given by the Rev. Richard Barbour at the September 2006 board meeting:

"Gracious God, you have richly blessed our nation and this community. Help us to remember your generosity and give thanks for your goodness. Bless the elected leaders of the Greece Town Board as they conduct the business of our town this evening. Give them

wisdom, courage, discernment and a single-minded desire to serve the common good. We ask your blessing on all public servants, and especially on our police force, firefighters, and emergency medical personnel. . . . Respectful of every religious tradition, I offer this prayer in the name of God's only son Jesus Christ, the Lord, Amen." *Id.*, at 98a–99a.

Respondents point to other invocations that disparaged those who did not accept the town's prayer practice. One guest minister characterized objectors as a "minority" who are "ignorant of the history of our country," *id.*, at 108a, while another lamented that other towns did not have "God-fearing" leaders, *id.,* at 79a. Although these two remarks strayed from the rationale set out in *Marsh*, they do not despoil a practice that on the whole reflects and embraces our tradition. Absent a pattern of prayers that over time denigrate, proselytize, or betray an impermissible government purpose, a challenge based solely on the content of a prayer will not likely establish a constitutional violation. *Marsh*, indeed, requires an inquiry into the prayer opportunity as a whole, rather than into the contents of a single prayer. 463 U. S., at 794–795.

Finally, the Court disagrees with the view taken by the Court of Appeals that the town of Greece contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer. The town made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one. That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths. So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to

achieve religious balancing. The quest to promote "a 'diversity' of religious views" would require the town "to make wholly inappropriate judgments about the number of religions [it] should sponsor and the relative frequency with which it should sponsor each," *Lee*, 505 U. S., at 617 (Souter, J., concurring), a form of government entanglement with religion that is far more troublesome than the current approach.

## B

Respondents further seek to distinguish the town's prayer practice from the tradition upheld in *Marsh* on the ground that it coerces participation by nonadherents. They and some *amici* contend that prayer conducted in the intimate setting of a town board meeting differs in fundamental ways from the invocations delivered in Congress and state legislatures, where the public remains segregated from legislative activity and may not address the body except by occasional invitation. Citizens attend town meetings, on the other hand, to accept awards; speak on matters of local importance; and petition the board for action that may affect their economic interests, such as the granting of permits, business licenses, and zoning variances. Respondents argue that the public may feel subtle pressure to participate in prayers that violate their beliefs in order to please the board members from whom they are about to seek a favorable ruling. In their view the fact that board members in small towns know many of their constituents by name only increases the pressure to conform.

It is an elemental First Amendment principle that government may not coerce its citizens "to support or participate in any religion or its exercise." *County of Allegheny*, 492 U. S., at 659 (KENNEDY, J., concurring in judgment in part and dissenting in part); see also *Van Orden*, 545 U. S., at 683 (plurality opinion) (recognizing

that our "institutions must not press religious observances upon their citizens"). On the record in this case the Court is not persuaded that the town of Greece, through the act of offering a brief, solemn, and respectful prayer to open its monthly meetings, compelled its citizens to engage in a religious observance. The inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.

The prayer opportunity in this case must be evaluated against the backdrop of historical practice. As a practice that has long endured, legislative prayer has become part of our heritage and tradition, part of our expressive idiom, similar to the Pledge of Allegiance, inaugural prayer, or the recitation of "God save the United States and this honorable Court" at the opening of this Court's sessions. See *Lynch*, 465 U. S., at 693 (O'Connor, J., concurring). It is presumed that the reasonable observer is acquainted with this tradition and understands that its purposes are to lend gravity to public proceedings and to acknowledge the place religion holds in the lives of many private citizens, not to afford government an opportunity to proselytize or force truant constituents into the pews. See *Salazar* v. *Buono*, 559 U. S. 700, 720–721 (2010) (plurality opinion); *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 308 (2000). That many appreciate these acknowledgments of the divine in our public institutions does not suggest that those who disagree are compelled to join the expression or approve its content. *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943).

The principal audience for these invocations is not, indeed, the public but lawmakers themselves, who may find that a moment of prayer or quiet reflection sets the mind to a higher purpose and thereby eases the task of governing. The District Court in *Marsh* described the prayer exercise as "an internal act" directed at the Nebraska Legislature's "own members," *Chambers* v. *Marsh*,

504 F. Supp. 585, 588 (Neb. 1980), rather than an effort to promote religious observance among the public. See also *Lee*, 505 U. S., at 630, n. 8 (Souter, J., concurring) (describing *Marsh* as a case "in which government officials invoke[d] spiritual inspiration entirely for their own benefit"); *Atheists of Fla., Inc.* v. *Lakeland*, 713 F. 3d 577, 583 (CA11 2013) (quoting a city resolution providing for prayer "for the benefit and blessing of" elected leaders); Madison's Detached Memoranda 558 (characterizing prayer in Congress as "religious worship for national representatives"); Brief for U. S. Senator Marco Rubio et al. as *Amici Curiae* 30–33; Brief for 12 Members of Congress as *Amici Curiae* 6. To be sure, many members of the public find these prayers meaningful and wish to join them. But their purpose is largely to accommodate the spiritual needs of lawmakers and connect them to a tradition dating to the time of the Framers. For members of town boards and commissions, who often serve part-time and as volunteers, ceremonial prayer may also reflect the values they hold as private citizens. The prayer is an opportunity for them to show who and what they are without denying the right to dissent by those who disagree.

The analysis would be different if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity. No such thing occurred in the town of Greece. Although board members themselves stood, bowed their heads, or made the sign of the cross during the prayer, they at no point solicited similar gestures by the public. Respondents point to several occasions where audience members were asked to rise for the prayer. These requests, however, came not from town leaders but from the guest ministers, who presumably are accustomed to directing their congregations in this way and might have done so thinking the action was inclusive,

not coercive. See App. 69a ("Would you bow your heads with me as we invite the Lord's presence here tonight?"); *id.*, at 93a ("Let us join our hearts and minds together in prayer"); *id.,* at 102a ("Would you join me in a moment of prayer?"); *id.,* at 110a ("Those who are willing may join me now in prayer"). Respondents suggest that constituents might feel pressure to join the prayers to avoid irritating the officials who would be ruling on their petitions, but this argument has no evidentiary support. Nothing in the record indicates that town leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invocation or quietly declined. In no instance did town leaders signal disfavor toward nonpartici-pants or suggest that their stature in the community was in any way diminished. A practice that classified citizens based on their religious views would violate the Constitu-tion, but that is not the case before this Court.

In their declarations in the trial court, respondents stated that the prayers gave them offense and made them feel excluded and disrespected. Offense, however, does not equate to coercion. Adults often encounter speech they find disagreeable; and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions. See *Elk Grove Uni-fied School Dist.* v. *Newdow*, 542 U. S. 1, 44 (2004) (O'Connor, J., concurring) ("The compulsion of which Justice Jackson was concerned . . . was of the direct sort— the Constitution does not guarantee citizens a right entirely to avoid ideas with which they disagree"). If circum-stances arise in which the pattern and practice of ceremo-nial, legislative prayer is alleged to be a means to coerce or intimidate others, the objection can be addressed in the

regular course. But the showing has not been made here, where the prayers neither chastised dissenters nor attempted lengthy disquisition on religious dogma. Courts remain free to review the pattern of prayers over time to determine whether they comport with the tradition of solemn, respectful prayer approved in *Marsh*, or whether coercion is a real and substantial likelihood. But in the general course legislative bodies do not engage in impermissible coercion merely by exposing constituents to prayer they would rather not hear and in which they need not participate. See *County of Allegheny*, 492 U. S., at 670 (KENNEDY, J., concurring in judgment in part and dissenting in part).

This case can be distinguished from the conclusions and holding of *Lee* v. *Weisman*, 505 U. S. 577. There the Court found that, in the context of a graduation where school authorities maintained close supervision over the conduct of the students and the substance of the ceremony, a religious invocation was coercive as to an objecting student. *Id.,* at 592–594; see also *Santa Fe Independent School Dist.*, 530 U. S., at 312. Four Justices dissented in *Lee*, but the circumstances the Court confronted there are not present in this case and do not control its outcome. Nothing in the record suggests that members of the public are dissuaded from leaving the meeting room during the prayer, arriving late, or even, as happened here, making a later protest. In this case, as in *Marsh*, board members and constituents are "free to enter and leave with little comment and for any number of reasons." *Lee*, *supra,* at 597. Should nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy. And should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed. Neither choice represents an unconstitutional imposition as to mature adults, who "presumably"

are "not readily susceptible to religious indoctrination or peer pressure." *Marsh*, 463 U. S., at 792 (internal quotation marks and citations omitted).

In the town of Greece, the prayer is delivered during the ceremonial portion of the town's meeting. Board members are not engaged in policymaking at this time, but in more general functions, such as swearing in new police officers, inducting high school athletes into the town hall of fame, and presenting proclamations to volunteers, civic groups, and senior citizens. It is a moment for town leaders to recognize the achievements of their constituents and the aspects of community life that are worth celebrating. By inviting ministers to serve as chaplain for the month, and welcoming them to the front of the room alongside civic leaders, the town is acknowledging the central place that religion, and religious institutions, hold in the lives of those present. Indeed, some congregations are not simply spiritual homes for town residents but also the provider of social services for citizens regardless of their beliefs. See App. 31a (thanking a pastor for his "community involvement"); *id.*, at 44a (thanking a deacon "for the job that you have done on behalf of our community"). The inclusion of a brief, ceremonial prayer as part of a larger exercise in civic recognition suggests that its purpose and effect are to acknowledge religious leaders and the institutions they represent rather than to exclude or coerce nonbelievers.

Ceremonial prayer is but a recognition that, since this Nation was founded and until the present day, many Americans deem that their own existence must be understood by precepts far beyond the authority of government to alter or define and that willing participation in civic affairs can be consistent with a brief acknowledgment of their belief in a higher power, always with due respect for those who adhere to other beliefs. The prayer in this case has a permissible ceremonial purpose. It is not an unconstitutional establishment of religion.

Opinion of the Court

\*      \*      \*

The town of Greece does not violate the First Amendment by opening its meetings with prayer that comports with our tradition and does not coerce participation by nonadherents.  The judgment of the U. S. Court of Appeals for the Second Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–696

_____

## TOWN OF GREECE, NEW YORK, PETITIONER *v.* SUSAN GALLOWAY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 5, 2014]

JUSTICE ALITO, with whom JUSTICE SCALIA joins,
concurring.

I write separately to respond to the principal dissent,
which really consists of two very different but intertwined
opinions. One is quite narrow; the other is sweeping. I
will address both.

I

First, however, since the principal dissent accuses the
Court of being blind to the facts of this case, *post*, at 20
(opinion of KAGAN, J.), I recount facts that I find particu-
larly salient.

The town of Greece is a municipality in upstate New
York that borders the city of Rochester. The town decided
to emulate a practice long established in Congress and
state legislatures by having a brief prayer before sessions
of the town board. The task of lining up clergy members
willing to provide such a prayer was given to the town's
office of constituent services. 732 F. Supp. 2d 195, 197–
198 (WDNY 2010). For the first four years of the practice,
a clerical employee in the office would randomly call reli-
gious organizations listed in the Greece "Community
Guide," a local directory published by the Greece Chamber
of Commerce, until she was able to find somebody willing
to give the invocation. *Id.,* at 198. This employee eventu-

ally began keeping a list of individuals who had agreed to give the invocation, and when a second clerical employee took over the task of finding prayer-givers, the first employee gave that list to the second. *Id.,* at 198, 199. The second employee then randomly called organizations on that list—and possibly others in the Community Guide— until she found someone who agreed to provide the prayer. *Id.*, at 199.

Apparently, all the houses of worship listed in the local Community Guide were Christian churches. *Id.*, at 198– 200, 203. That is unsurprising given the small number of non-Christians in the area. Although statistics for the town of Greece alone do not seem to be available, statistics have been compiled for Monroe County, which includes both the town of Greece and the city of Rochester. According to these statistics, of the county residents who have a religious affiliation, about 3% are Jewish, and for other non-Christian faiths, the percentages are smaller.[1] There are no synagogues within the borders of the town of Greece, *id.*, at 203, but there are several not far away across the Rochester border. Presumably, Jewish residents of the town worship at one or more of those synagogues, but because these synagogues fall outside the town's borders, they were not listed in the town's local directory, and the responsible town employee did not include them on her list. *Ibid.* Nor did she include any other non-Christian house of worship. *Id.*, at 198–200.[2]

_____

[1] See Assn. of Statisticians of Am. Religious Bodies, C. Grammich et al., 2010 U. S. Religion Census: Religious Congregations & Membership Study 400–401 (2012).

[2] It appears that there is one non-Christian house of worship, a Buddhist temple, within the town's borders, but it was not listed in the town directory. 732 F. Supp. 2d, at 203. Although located within the town's borders, the temple has a Rochester mailing address. And while the respondents "each lived in the Town more than thirty years, neither was personally familiar with any mosques, synagogues, temples, or other non-Christian places of worship within the Town." *Id.*, at 197.

As a result of this procedure, for some time all the prayers at the beginning of town board meetings were offered by Christian clergy, and many of these prayers were distinctively Christian. But respondents do not claim that the list was attributable to religious bias or favoritism, and the Court of Appeals acknowledged that the town had "no religious animus." 681 F. 3d 20, 32 (CA2 2012).

For some time, the town's practice does not appear to have elicited any criticism, but when complaints were received, the town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request to offer an invocation. *Id.*, at 23, 25; 732 F. Supp. 2d, at 197. The most recent list in the record of persons available to provide an invocation includes representatives of many non-Christian faiths. App. in No. 10–3635 (CA2), pp. A1053–A1055 (hereinafter CA2 App.).

Meetings of the Greece Town Board appear to have been similar to most other town council meetings across the country. The prayer took place at the beginning of the meetings. The board then conducted what might be termed the "legislative" portion of its agenda, during which residents were permitted to address the board. After this portion of the meeting, a separate stage of the meetings was devoted to such matters as formal requests for variances. See Brief for Respondents 5–6; CA2 App. A929–A930; *e.g.*, CA2 App. A1058, A1060.

No prayer occurred before this second part of the proceedings, and therefore I do not understand this case to involve the constitutionality of a prayer prior to what may be characterized as an adjudicatory proceeding. The prayer preceded only the portion of the town board meeting that I view as essentially legislative. While it is true that the matters considered by the board during this initial part of the meeting might involve very specific questions, such as the installation of a traffic light or stop

sign at a particular intersection, that does not transform the nature of this part of the meeting.

## II

I turn now to the narrow aspect of the principal dissent, and what we find here is that the principal dissent's objection, in the end, is really quite niggling. According to the principal dissent, the town could have avoided any constitutional problem in either of two ways.

## A

First, the principal dissent writes, "[i]f the Town Board had let its chaplains know that they should speak in nonsectarian terms, common to diverse religious groups, then no one would have valid grounds for complaint." *Post*, at 18–19. "Priests and ministers, rabbis and imams," the principal dissent continues, "give such invocations all the time" without any great difficulty. *Post*, at 19.

Both Houses of Congress now advise guest chaplains that they should keep in mind that they are addressing members from a variety of faith traditions, and as a matter of policy, this advice has much to recommend it. But any argument that nonsectarian prayer is constitutionally required runs headlong into a long history of contrary congressional practice. From the beginning, as the Court notes, many Christian prayers were offered in the House and Senate, see *ante*, at 7, and when rabbis and other non-Christian clergy have served as guest chaplains, their prayers have often been couched in terms particular to their faith traditions.[3]

_____

[3] For example, when a rabbi first delivered a prayer at a session of the House of Representatives in 1860, he appeared "in full rabbinic dress, 'piously bedecked in a white tallit and a large velvet skullcap,'" and his prayer "invoked several uniquely Jewish themes and repeated the Biblical priestly blessing in Hebrew." See Brief for Nathan Lewin as *Amicus Curiae* 9. Many other rabbis have given distinctively Jewish prayers, *id.*, at 10, and n. 3, and distinctively Islamic, Buddhist, and

Not only is there no historical support for the proposition that only generic prayer is allowed, but as our country has become more diverse, composing a prayer that is acceptable to all members of the community who hold religious beliefs has become harder and harder. It was one thing to compose a prayer that is acceptable to both Christians and Jews; it is much harder to compose a prayer that is also acceptable to followers of Eastern religions that are now well represented in this country. Many local clergy may find the project daunting, if not impossible, and some may feel that they cannot in good faith deliver such a vague prayer.

In addition, if a town attempts to go beyond simply *recommending* that a guest chaplain deliver a prayer that is broadly acceptable to all members of a particular community (and the groups represented in different communities will vary), the town will inevitably encounter sensitive problems. Must a town screen and, if necessary, edit prayers before they are given? If prescreening is not required, must the town review prayers after they are delivered in order to determine if they were sufficiently generic? And if a guest chaplain crosses the line, what must the town do? Must the chaplain be corrected on the spot? Must the town strike this chaplain (and perhaps his or her house of worship) from the approved list?

## B

If a town wants to avoid the problems associated with this first option, the principal dissent argues, it has another choice: It may "invit[e] clergy of many faiths." *Post*, at 19. "When one month a clergy member refers to Jesus, and the next to Allah or Jehovah," the principal dissent explains, "the government does not identify itself with one religion or align itself with that faith's citizens, and the

_____

Hindu prayers have also been delivered, see *ante*, at 10–11.

effect of even sectarian prayer is transformed." *Ibid.*

If, as the principal dissent appears to concede, such a rotating system would obviate any constitutional problems, then despite all its high rhetoric, the principal dissent's quarrel with the town of Greece really boils down to this: The town's clerical employees did a bad job in compiling the list of potential guest chaplains. For that is really the only difference between what the town did and what the principal dissent is willing to accept. The Greece clerical employee drew up her list using the town directory instead of a directory covering the entire greater Rochester area. If the task of putting together the list had been handled in a more sophisticated way, the employee in charge would have realized that the town's Jewish residents attended synagogues on the Rochester side of the border and would have added one or more synagogues to the list. But the mistake was at worst careless, and it was not done with a discriminatory intent. (I would view this case very differently if the omission of these synagogues were intentional.)

The informal, imprecise way in which the town lined up guest chaplains is typical of the way in which many things are done in small and medium-sized units of local government. In such places, the members of the governing body almost always have day jobs that occupy much of their time. The town almost never has a legal office and instead relies for legal advice on a local attorney whose practice is likely to center on such things as land-use regulation, contracts, and torts. When a municipality like the town of Greece seeks in good faith to emulate the congressional practice on which our holding in *Marsh* v. *Chambers,* 463 U. S. 783 (1983), was largely based, that municipality should not be held to have violated the Constitution simply because its method of recruiting guest chaplains lacks the demographic exactitude that might be regarded as optimal.

The effect of requiring such exactitude would be to pressure towns to forswear altogether the practice of having a prayer before meetings of the town council. Many local officials, puzzled by our often puzzling Establishment Clause jurisprudence and terrified of the legal fees that may result from a lawsuit claiming a constitutional violation, already think that the safest course is to ensure that local government is a religion-free zone. Indeed, the Court of Appeals' opinion in this case advised towns that constitutional difficulties "may well prompt municipalities to pause and think carefully before adopting legislative prayer." 681 F. 3d, at 34. But if, as precedent and historic practice make clear (and the principal dissent concedes), prayer before a legislative session is not inherently inconsistent with the First Amendment, then a unit of local government should not be held to have violated the First Amendment simply because its procedure for lining up guest chaplains does not comply in all respects with what might be termed a "best practices" standard.

## III

While the principal dissent, in the end, would demand no more than a small modification in the procedure that the town of Greece initially followed, much of the rhetoric in that opinion sweeps more broadly. Indeed, the logical thrust of many of its arguments is that prayer is *never* permissible prior to meetings of local government legislative bodies. At Greece Town Board meetings, the principal dissent pointedly notes, ordinary citizens (and even children!) are often present. *Post*, at 10–11. The guest chaplains stand in front of the room facing the public. "[T]he setting is intimate," and ordinary citizens are permitted to speak and to ask the board to address problems that have a direct effect on their lives. *Post*, at 11. The meetings are "occasions for ordinary citizens to engage with and petition their government, often on highly individualized

matters." *Post*, at 9. Before a session of this sort, the principal dissent argues, any prayer that is not acceptable to all in attendance is out of bounds.

The features of Greece meetings that the principal dissent highlights are by no means unusual.[4] It is common for residents to attend such meetings, either to speak on matters on the agenda or to request that the town address other issues that are important to them. Nor is there anything unusual about the occasional attendance of students, and when a prayer is given at the beginning of such a meeting, I expect that the chaplain generally stands at the front of the room and faces the public. To do otherwise would probably be seen by many as rude. Finally, although the principal dissent, *post*, at 13, attaches importance to the fact that guest chaplains in the town of Greece often began with the words "Let us pray," that is also commonplace and for many clergy, I suspect, almost reflexive.[5] In short, I see nothing out of the ordinary about any of the features that the principal dissent notes. Therefore, if prayer is not allowed at meetings with those characteristics, local government legislative bodies, unlike their national and state counterparts, cannot begin their meetings with a prayer. I see no sound basis for drawing such a distinction.

—————————

[4] See, *e.g.*, prayer practice of Saginaw City Council in Michigan, described in Letter from Freedom from Religion Foundation to City Manager, Saginaw City Council (Jan. 31, 2014), online at http://media.mlive.com/saginawnews_impact/other/Saginaw%20prayer%20at%20meetings%20letter.pdf (all Internet materials as visited May 2, 2014, and available in Clerk of Court's case file); prayer practice of Cobb County commissions in Georgia, described in *Pelphrey* v. *Cobb County,* 410 F. Supp. 2d 1324 (ND Ga. 2006).

[5] For example, at the most recent Presidential inauguration, a minister faced the assembly of onlookers on the National Mall and began with those very words. 159 Cong. Rec. S183, S186 (Jan. 22, 2013).

## IV

The principal dissent claims to accept the Court's decision in *Marsh* v. *Chambers*, which upheld the constitutionality of the Nebraska Legislature's practice of prayer at the beginning of legislative sessions, but the principal dissent's acceptance of *Marsh* appears to be predicated on the view that the prayer at issue in that case was little more than a formality to which the legislators paid scant attention. The principal dissent describes this scene: A session of the state legislature begins with or without most members present; a strictly nonsectarian prayer is recited while some legislators remain seated; and few members of the public are exposed to the experience. *Post*, at 8–9. This sort of perfunctory and hidden-away prayer, the principal dissent implies, is all that *Marsh* and the First Amendment can tolerate.

It is questionable whether the principal dissent accurately describes the Nebraska practice at issue in *Marsh*,[6] but what is important is not so much what happened in Nebraska in the years prior to *Marsh*, but what happened before congressional sessions during the period leading up to the adoption of the First Amendment. By that time, prayer before legislative sessions already had an impressive pedigree, and it is important to recall that history and the events that led to the adoption of the practice.

The principal dissent paints a picture of "morning in

---

[6] See generally Brief for Robert E. Palmer as *Amicus Curiae* (Nebraska Legislature chaplain at issue in *Marsh*); *e.g.*, *id.*, at 11 (describing his prayers as routinely referring "to Christ, the Bible, [and] holy days"). See also *Chambers* v. *Marsh*, 504 F. Supp. 585, 590, n. 12 (Neb. 1980) ("A rule of the Nebraska Legislature requires that 'every member shall be present within the Legislative Chamber during the meetings of the Legislature . . . unless excused . . . .' Unless the excuse for nonattendance is deemed sufficient by the legislature, the 'presence of any member may be compelled, if necessary, by sending the Sergeant at Arms' " (alterations in original)).

Nebraska" circa 1983, see *post*, at 9, but it is more instructive to consider "morning in Philadelphia," September 1774. The First Continental Congress convened in Philadelphia, and the need for the 13 colonies to unite was imperative. But "[m]any things set colony apart from colony," and prominent among these sources of division was religion.[7] "Purely as a practical matter," however, the project of bringing the colonies together required that these divisions be overcome.[8]

Samuel Adams sought to bridge these differences by prodding a fellow Massachusetts delegate to move to open the session with a prayer.[9] As John Adams later recounted, this motion was opposed on the ground that the delegates were "so divided in religious sentiments, some Episcopalians, some Quakers, some Anabaptists, some Presbyterians, and some Congregationalists, that [they] could not join in the same act of worship."[10] In response, Samuel Adams proclaimed that "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country."[11] Putting aside his personal prejudices,[12] he moved to invite a local Anglican minister, Jacob Duché, to lead the first prayer.[13]

The following morning, Duché appeared in full "pontifi-

--------

[7] G. Wills, Inventing America: Jefferson's Declaration of Independence 46 (1978).

[8] N. Cousins, In God We Trust: The Religious Beliefs and Ideas of the American Founding Fathers 4–5, 13 (1958).

[9] M. Puls, Samuel Adams: Father of the American Revolution 160 (2006).

[10] Letter to Abigail Adams (Sept. 16, 1774), in C. Adams, Familiar Letters of John Adams and His Wife Abigail Adams, During the Revolution 37 (1876).

[11] *Ibid.*

[12] See G. Wills, *supra*, at 46; J. Miller, Sam Adams 85, 87 (1936); I. Stoll, Samuel Adams: A Life 7, 134–135 (2008).

[13] C. Adams, *supra*, at 37.

cals" and delivered both the Anglican prayers for the day and an extemporaneous prayer.[14]  For many of the delegates—members of religious groups that had come to America to escape persecution in Britain—listening to a distinctively Anglican prayer by a minister of the Church of England represented an act of notable ecumenism.  But Duché's prayer met with wide approval—John Adams wrote that it "filled the bosom of every man" in attendance[15]—and the practice was continued.  This first congressional prayer was emphatically Christian, and it was neither an empty formality nor strictly nondenominational.[16]  But one of its purposes, and presumably one of its effects, was not to divide, but to unite.

It is no wonder, then, that the practice of beginning congressional sessions with a prayer was continued after the Revolution ended and the new Constitution was adopted.  One of the first actions taken by the new Congress when it convened in 1789 was to appoint chaplains for both Houses.  The first Senate chaplain, an Episcopalian, was appointed on April 25, 1789, and the first House chaplain, a Presbyterian, was appointed on May 1.[17]  Three days later, Madison announced that he planned to introduce proposed constitutional amendments to protect individual rights; on June 8, 1789, those amendments were introduced; and on September 26, 1789, the amendments were approved to be sent to the States for ratification.[18]  In the years since the adoption of the First

—————

[14] *Ibid.*

[15] *Ibid.*; see W. Wells, 2 The Life and Public Services of Samuel Adams 222–223 (1865); J. Miller, *supra,* at 320; E. Burnett, The Continental Congress 40 (1941); M. Puls, *supra,* at 161.

[16] First Prayer of the Continental Congress, 1774, online at http://chaplain.house.gov/archive/continental.html.

[17] 1 Annals of Cong. 24–25 (1789); R. Cord, Separation of Church and State: Historical Fact and Current Fiction 23 (1982).

[18] 1 Annals of Cong. 247, 424; R. Labunski, James Madison and the Struggle for the Bill of Rights 240–241 (2006).

Amendment, the practice of prayer before sessions of the House and Senate has continued, and opening prayers from a great variety of faith traditions have been offered.

This Court has often noted that actions taken by the First Congress are presumptively consistent with the Bill of Rights, see, *e.g.*, *Harmelin* v. *Michigan*, 501 U. S. 957, 980 (1991), *Carroll* v. *United States*, 267 U. S. 132, 150– 152 (1925), and this principle has special force when it comes to the interpretation of the Establishment Clause. This Court has always purported to base its Establish- ment Clause decisions on the original meaning of that provision. Thus, in *Marsh,* when the Court was called upon to decide whether prayer prior to sessions of a state legislature was consistent with the Establishment Clause, we relied heavily on the history of prayer before sessions of Congress and held that a state legislature may follow a similar practice. See 463 U. S., at 786–792.

There can be little doubt that the decision in *Marsh* reflected the original understanding of the First Amend- ment. It is virtually inconceivable that the First Congress, having appointed chaplains whose responsibilities promi- nently included the delivery of prayers at the beginning of each daily session, thought that this practice was incon- sistent with the Establishment Clause. And since this practice was well established and undoubtedly well known, it seems equally clear that the state legislatures that ratified the First Amendment had the same under- standing. In the case before us, the Court of Appeals appeared to base its decision on one of the Establishment Clause "tests" set out in the opinions of this Court, see 681 F. 3d, at 26, 30, but if there is any inconsistency between any of those tests and the historic practice of legislative prayer, the inconsistency calls into question the validity of the test, not the historic practice.

## V

This brings me to my final point. I am troubled by the message that some readers may take from the principal dissent's rhetoric and its highly imaginative hypotheticals. For example, the principal dissent conjures up the image of a litigant awaiting trial who is asked by the presiding judge to rise for a Christian prayer, of an official at a polling place who conveys the expectation that citizens wishing to vote make the sign of the cross before casting their ballots, and of an immigrant seeking naturalization who is asked to bow her head and recite a Christian prayer. Although I do not suggest that the implication is intentional, I am concerned that at least some readers will take these hypotheticals as a warning that this is where today's decision leads—to a country in which religious minorities are denied the equal benefits of citizenship.

Nothing could be further from the truth. All that the Court does today is to allow a town to follow a practice that we have previously held is permissible for Congress and state legislatures. In seeming to suggest otherwise, the principal dissent goes far astray.

# SUPREME COURT OF THE UNITED STATES

No. 12–696

TOWN OF GREECE, NEW YORK, PETITIONER *v.*
SUSAN GALLOWAY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 5, 2014]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to Part II, concurring in part and concurring in the judgment.

Except for Part II–B, I join the opinion of the Court, which faithfully applies *Marsh* v. *Chambers*, 463 U. S. 783 (1983). I write separately to reiterate my view that the Establishment Clause is "best understood as a federalism provision," *Elk Grove Unified School Dist.* v. *Newdow*, 542 U. S. 1, 50 (2004) (THOMAS, J., concurring in judgment), and to state my understanding of the proper "coercion" analysis.

I

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U. S. Const., Amdt. 1. As I have explained before, the text and history of the Clause "resis[t] incorporation" against the States. *Newdow*, *supra,* at 45–46; see also *Van Orden* v. *Perry*, 545 U. S. 677, 692–693 (2005) (THOMAS, J., concurring); *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 677–680 (2002) (same). If the Establishment Clause is not incorporated, then it has no application here, where only municipal action is at issue.

As an initial matter, the Clause probably prohibits Congress from establishing a national religion. Cf. D.

Drakeman, Church, State, and Original Intent 260–262 (2010). The text of the Clause also suggests that Congress "could not interfere with state establishments, notwithstanding any argument that could be made based on Congress' power under the Necessary and Proper Clause." *Newdow*, *supra,* at 50 (opinion of THOMAS, J.). The language of the First Amendment ("Congress shall make no law") "precisely tracked and inverted the exact wording" of the Necessary and Proper Clause ("Congress shall have power . . . to make all laws which shall be necessary and proper . . . "), which was the subject of fierce criticism by Anti-Federalists at the time of ratification. A. Amar, The Bill of Rights 39 (1998) (hereinafter Amar); see also Natelson, The Framing and Adoption of the Necessary and Proper Clause, in The Origins of the Necessary and Proper Clause 84, 94–96 (G. Lawson, G. Miller, R. Natelson, & G. Seidman eds. 2010) (summarizing Anti-Federalist claims that the Necessary and Proper Clause would aggrandize the powers of the Federal Government). That choice of language—"Congress shall make no law"—effectively denied Congress any power to regulate state establishments.

Construing the Establishment Clause as a federalism provision accords with the variety of church-state arrangements that existed at the Founding. At least six States had established churches in 1789. Amar 32–33. New England States like Massachusetts, Connecticut, and New Hampshire maintained local-rule establishments whereby the majority in each town could select the minister and religious denomination (usually Congregationalism, or "Puritanism"). McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2110 (2003); see also L. Levy, The Establishment Clause: Religion and the First Amendment 29–51 (1994) (hereinafter Levy). In the South, Maryland, South Carolina, and Georgia eliminated

their exclusive Anglican establishments following the American Revolution and adopted general establishments, which permitted taxation in support of all Christian churches (or, as in South Carolina, all Protestant churches). See Levy 52–58; Amar 32–33. Virginia, by contrast, had recently abolished its official state establishment and ended direct government funding of clergy after a legislative battle led by James Madison. See T. Buckley, Church and State in Revolutionary Virginia, 1776–1787, pp. 155–164 (1977). Other States—principally Rhode Island, Pennsylvania, and Delaware, which were founded by religious dissenters—had no history of formal establishments at all, although they still maintained religious tests for office. See McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1425–1426, 1430 (1990).

The import of this history is that the relationship between church and state in the fledgling Republic was far from settled at the time of ratification. See Muñoz, The Original Meaning of the Establishment Clause and the Impossibility of Its Incorporation, 8 U. Pa. J. Constitutional L. 585, 605 (2006). Although the remaining state establishments were ultimately dismantled—Massachusetts, the last State to disestablish, would do so in 1833, see Levy 42—that outcome was far from assured when the Bill of Rights was ratified in 1791. That lack of consensus suggests that the First Amendment was simply agnostic on the subject of state establishments; the decision to establish or disestablish religion was reserved to the States. Amar 41.

The Federalist logic of the original Establishment Clause poses a special barrier to its mechanical incorporation against the States through the Fourteenth Amendment. See *id.,* at 33. Unlike the Free Exercise Clause, which "plainly protects individuals against congressional interference with the right to exercise their religion," the

Establishment Clause "does not purport to protect indi-
vidual rights." *Newdow*, 542 U. S*.,* at 50 (opinion of
THOMAS, J.). Instead, the States are the particular benefi-
ciaries of the Clause. Incorporation therefore gives rise to
a paradoxical result: Applying the Clause against the
States eliminates their right to establish a religion free
from federal interference, thereby "prohibit[ing] exactly
what the Establishment Clause protected." *Id.,* at 51; see
Amar 33–34.

Put differently, the structural reasons that counsel
against incorporating the Tenth Amendment also apply to
the Establishment Clause. *Id.,* at 34. To my knowledge,
no court has ever suggested that the Tenth Amendment,
which "reserve[s] to the States" powers not delegated to
the Federal Government, could or should be applied
against the States. To incorporate that limitation would
be to divest the States of all powers not specifically dele-
gated to them, thereby inverting the original import of the
Amendment. Incorporating the Establishment Clause has
precisely the same effect.

The most cogent argument in favor of incorporation may
be that, by the time of Reconstruction, the framers of the
Fourteenth Amendment had come to reinterpret the Es-
tablishment Clause (notwithstanding its Federalist ori-
gins) as expressing an individual right. On this question,
historical evidence from the 1860's is mixed. Congressmen
who catalogued the personal rights protected by the First
Amendment commonly referred to speech, press, petition,
and assembly, but not to a personal right of nonestablish-
ment; instead, they spoke only of "'free exercise'" or
"'freedom of conscience.'" Amar 253, and 385, n. 91 (col-
lecting sources). There may be reason to think these lists
were abbreviated, and silence on the issue is not disposi-
tive. See Lash, The Second Adoption of the Establishment
Clause: The Rise of the Nonestablishment Principle, 27
Ariz. St. L. J. 1085, 1141–1145 (1995); but cf. S. Smith,

Foreordained Failure: The Quest for a Constitutional Principle of Religious Freedom 50–52 (1995). Given the textual and logical difficulties posed by incorporation, however, there is no warrant for transforming the meaning of the Establishment Clause without a firm historical foundation. See *Newdow*, *supra*, at 51 (opinion of THOMAS, J.). The burden of persuasion therefore rests with those who claim that the Clause assumed a different meaning upon adoption of the Fourteenth Amendment.[1]

## II

Even if the Establishment Clause were properly incorporated against the States, the municipal prayers at issue in this case bear no resemblance to the coercive state establishments that existed at the founding. "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*." *Lee* v. *Weisman*, 505 U. S. 577, 640 (1992) (SCALIA, J., dissent-

---

[1] This Court has never squarely addressed these barriers to the incorporation of the Establishment Clause. When the issue was first presented in *Everson* v. *Board of Ed. of Ewing*, 330 U. S. 1 (1947), the Court casually asserted that "the Fourteenth Amendment [has been] interpreted to make the prohibitions of the First applicable to state action abridging religious freedom. There is every reason to give the same application and broad interpretation to the 'establishment of religion' clause." *Id.*, at 15 (footnote omitted). The cases the Court cited in support of that proposition involved the Free Exercise Clause—which had been incorporated seven years earlier, in *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940)—not the Establishment Clause. 330 U. S., at 15, n. 22 (collecting cases). Thus, in the space of a single paragraph and a nonresponsive string citation, the *Everson* Court glibly effected a sea change in constitutional law. The Court's inattention to these doctrinal questions might be explained, although not excused, by the rise of popular conceptions about "separation of church and state" as an "American" constitutional right. See generally P. Hamburger, Separation of Church and State 454–463 (2002); see also *id.,* at 391–454 (discussing the role of nativist sentiment in the campaign for "separation" as an American ideal).

ing); see also *Perry*, 545 U. S., at 693–694 (THOMAS, J., concurring); *Cutter* v. *Wilkinson*, 544 U. S. 709, 729 (2005) (THOMAS, J., concurring); *Newdow*, *supra,* at 52 (opinion of THOMAS, J.). In a typical case, attendance at the established church was mandatory, and taxes were levied to generate church revenue. McConnell, Establishment and Disestablishment*,* at 2144–2146, 2152–2159. Dissenting ministers were barred from preaching, and political participation was limited to members of the established church. *Id.,* at 2161–2168, 2176–2180.

This is not to say that the state establishments in existence when the Bill of Rights was ratified were uniform. As previously noted, establishments in the South were typically governed through the state legislature or State Constitution, while establishments in New England were administered at the municipal level. See *supra,* at 2–3. Notwithstanding these variations, both state and local forms of establishment involved "actual legal coercion," *Newdow*, *supra,* at 52 (opinion of THOMAS, J.): They exercised government power in order to exact financial support of the church, compel religious observance, or control religious doctrine.

None of these founding-era state establishments remained at the time of Reconstruction. But even assuming that the framers of the Fourteenth Amendment reconceived the nature of the Establishment Clause as a constraint on the States, nothing in the history of the intervening period suggests a fundamental transformation in their understanding of *what constituted an establishment.* At a minimum, there is no support for the proposition that the framers of the Fourteenth Amendment embraced wholly modern notions that the Establishment Clause is violated whenever the "reasonable observer" feels "subtle pressure," *ante*, at 18, 19, or perceives governmental "endors[ement]," *ante*, at 5–6. For example, of the 37 States in existence when the Fourteenth Amendment was rati-

fied, 27 State Constitutions "contained an explicit refer-
ence to God in their preambles."  Calabresi & Agudo,
Individual Rights Under State Constitutions When the
Fourteenth Amendment Was Ratified in 1868: What
Rights Are Deeply Rooted in American History and Tradi-
tion?, 87 Tex. L. Rev. 7, 12, 37 (2008).  In addition to the
preamble references, 30 State Constitutions contained
other references to the divine, using such phrases as "'Al-
mighty God,'" "'[O]ur Creator,'" and "'Sovereign Ruler of
the Universe.'"  *Id.,* at 37, 38, 39, n. 104.  Moreover, the
state constitutional provisions that prohibited religious
"comp[ulsion]" made clear that the relevant sort of com-
pulsion was legal in nature, of the same type that had
characterized founding-era establishments.[2]  These provi-
sions strongly suggest that, whatever nonestablishment
principles existed in 1868, they included no concern for the
finer sensibilities of the "reasonable observer."

Thus, to the extent coercion is relevant to the Estab-
lishment Clause analysis, it is actual legal coercion that
counts—not the "subtle coercive pressures" allegedly felt
by respondents in this case, *ante*, at 9.  The majority
properly concludes that "[o]ffense . . . does not equate to

_____

[2] See, *e.g.*, Del. Const., Art. I, §1 (1831) ("[N]o man shall, or ought to
be compelled to attend any religious worship, to contribute to the
erection or support of any place of worship, or to the maintenance of
any ministry, against his own free will and consent"); Me. Const., Art. I,
§3 (1820) ("[N]o one shall be hurt, molested or restrained in his person,
liberty or estate, for worshiping God in the manner and season most
agreeable to the dictates of his own conscience"); Mo. Const., Art. I, §10
(1865) ("[N]o person can be compelled to erect, support, or attend any
place of worship, or maintain any minister of the Gospel or teacher of
religion"); R. I. Const., Art. I, §3 (1842) ("[N]o man shall be compelled to
frequent or to support any religious worship, place, or ministry what-
ever, except in fulfillment of his own voluntary contract"); Vt. Const., Ch.
I, §3 (1777) ("[N]o man ought, or of right can be compelled to attend any
religious worship, or erect, or support any place of worship, or maintain
any minister, contrary to the dictates of his conscience").

coercion," since "[a]dults often encounter speech they find disagreeable[,] and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum." *Ante,* at 21. I would simply add, in light of the foregoing history of the Establishment Clause, that "[p]eer pressure, unpleasant as it may be, is not coercion" either. *Newdow,* 542 U. S*.,* at 49 (opinion of THOMAS, J.).

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–696

_____

## TOWN OF GREECE, NEW YORK, PETITIONER *v.* SUSAN GALLOWAY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 5, 2014]

JUSTICE BREYER, dissenting.

As we all recognize, this is a "fact-sensitive" case. *Ante*, at 19 (opinion of KENNEDY, J.); see also *post*, at 20 (KAGAN, J., dissenting); 681 F. 3d 20, 34 (CA2 2012) (explaining that the Court of Appeals' holding follows from the "totality of the circumstances"). The Court of Appeals did not believe that the Constitution forbids legislative prayers that incorporate content associated with a particular denomination. *Id.,* at 28. Rather, the court's holding took that content into account simply because it indicated that the town had not followed a sufficiently inclusive "prayer-giver selection process." *Id.,* at 30. It also took into account related "actions (and inactions) of prayer-givers and town officials." *Ibid.* Those actions and inactions included (1) a selection process that led to the selection of "clergy almost exclusively from places of worship located within the town's borders,"  despite the likelihood that significant numbers of town residents were members of congregations that gather just outside those borders; (2) a failure to "infor[m] members of the general public that volunteers" would be acceptable prayer givers; and (3) a failure to "infor[m] prayer-givers that invocations were not to be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invoca-

tional speaker."  *Id.,* at 31–32 (internal quotation marks omitted).

The Court of Appeals further emphasized what it was not holding.  It did not hold that "the town may not open its public meetings with a prayer," or that "any prayers offered in this context must be blandly 'nonsectarian.'" *Id.,* at 33.  In essence, the Court of Appeals merely held that the town must do more than it had previously done to try to make its prayer practices inclusive of other faiths.  And it did not prescribe a single constitutionally required method for doing so.

In my view, the Court of Appeals' conclusion and its reasoning are convincing.  JUSTICE KAGAN's dissent is consistent with that view, and I join it.  I also here emphasize several factors that I believe underlie the conclusion that, on the particular facts of this case, the town's prayer practice violated the Establishment Clause.

First, Greece is a predominantly Christian town, but it is not exclusively so.  A map of the town's houses of worship introduced in the District Court shows many Christian churches within the town's limits.  It also shows a Buddhist temple within the town and several Jewish synagogues just outside its borders, in the adjacent city of Rochester, New York.  *Id.,* at 24.  Yet during the more than 120 monthly meetings at which prayers were delivered during the record period (from 1999 to 2010), only four prayers were delivered by non-Christians.  And all of these occurred in 2008, shortly after the plaintiffs began complaining about the town's Christian prayer practice and nearly a decade after that practice had commenced.  See *post*, at 14, 21.

To be precise: During 2008, two prayers were delivered by a Jewish layman, one by the chairman of a Baha'i congregation, and one by a Wiccan priestess.  The Jewish and Wiccan prayer givers were invited only after they reached out to the town to inquire about giving an invoca-

tion.  The town apparently invited the Baha'i chairman on
its own initiative.  The inclusivity of the 2008 meetings,
which contrasts starkly with the exclusively single-
denomination prayers every year before and after, is
commendable.  But the Court of Appeals reasonably de-
cided not to give controlling weight to that inclusivity, for it
arose only in response to the complaints that presaged this
litigation, and it did not continue into the following years.

Second, the town made no significant effort to inform
the area's non-Christian houses of worship about the
possibility of delivering an opening prayer.  See *post*, at
21.  Beginning in 1999, when it instituted its practice of
opening its monthly board meetings with prayer, Greece
selected prayer givers as follows: Initially, the town's
employees invited clergy from each religious organization
listed in a "Community Guide" published by the Greece
Chamber of Commerce.  After that, the town kept a list of
clergy who had accepted invitations and reinvited those
clergy to give prayers at future meetings.  From time to
time, the town supplemented this list in response to re-
quests from citizens and to new additions to the Commu-
nity Guide and a town newspaper called the Greece Post.

The plaintiffs do not argue that the town intentionally
discriminated against non-Christians when choosing
whom to invite, 681 F. 3d, at 26, and the town claims,
plausibly, that it would have allowed anyone who asked to
give an invocation to do so.  Rather, the evident reasons
why the town consistently chose Christian prayer givers
are that the Buddhist and Jewish temples mentioned
above were not listed in the Community Guide or the
Greece Post and that the town limited its list of clergy
almost exclusively to representatives of houses of worship
situated within Greece's town limits (again, the Buddhist
temple on the map was within those limits, but the syna-
gogues were just outside them).  *Id.,* at 24, 31.

Third, in this context, the fact that nearly all of the

prayers given reflected a single denomination takes on significance. That significance would have been the same had all the prayers been Jewish, or Hindu, or Buddhist, or of any other denomination. The significance is that, in a context where religious minorities exist and where more could easily have been done to include their participation, the town chose to do nothing. It could, for example, have posted its policy of permitting anyone to give an invocation on its website, greeceny.gov, which provides dates and times of upcoming town board meetings along with minutes of prior meetings. It could have announced inclusive policies at the beginning of its board meetings, just before introducing the month's prayer giver. It could have provided information to those houses of worship of all faiths that lie just outside its borders and include citizens of Greece among their members. Given that the town could easily have made these or similar efforts but chose not to, the fact that all of the prayers (aside from the 2008 outliers) were given by adherents of a single religion reflects a lack of effort to include others. And that is what I take to be a major point of JUSTICE KAGAN's related discussion. See *post*, at 2–4, 9, 14–15, 21–23.

Fourth, the fact that the board meeting audience included citizens with business to conduct also contributes to the importance of making more of an effort to include members of other denominations. It does not, however, automatically change the nature of the meeting from one where an opening prayer is permissible under the Establishment Clause to one where it is not. Cf. *post*, at 8–14, 16–17, 20.

Fifth, it is not normally government's place to rewrite, to parse, or to critique the language of particular prayers. And it is always possible that members of one religious group will find that prayers of other groups (or perhaps even a moment of silence) are not compatible with their faith. Despite this risk, the Constitution does not forbid

opening prayers. But neither does the Constitution forbid efforts to explain to those who give the prayers the nature of the occasion and the audience.

The U. S. House of Representatives, for example, provides its guest chaplains with the following guidelines, which are designed to encourage the sorts of prayer that are consistent with the purpose of an invocation for a government body in a religiously pluralistic Nation:

> "The guest chaplain should keep in mind that the House of Representatives is comprised of Members of many different faith traditions.
> "The length of the prayer should not exceed 150 words.
> "The prayer must be free from personal political views or partisan politics, from sectarian controversies, and from any intimations pertaining to foreign or domestic policy." App. to Brief for Respondents 2a.

The town made no effort to promote a similarly inclusive prayer practice here. See *post*, at 21–22.

As both the Court and JUSTICE KAGAN point out, we are a Nation of many religions. *Ante*, at 10–11; *post*, at 1–2, 18. And the Constitution's Religion Clauses seek to "protec[t] the Nation's social fabric from religious conflict." *Zelman* v. *Simmons-Harris*, 536 U. S. 639, 717 (2002) (BREYER, J., dissenting). The question in this case is whether the prayer practice of the town of Greece, by doing too little to reflect the religious diversity of its citizens, did too much, even if unintentionally, to promote the "political division along religious lines" that "was one of the principal evils against which the First Amendment was intended to protect." *Lemon* v. *Kurtzman*, 403 U. S. 602, 622 (1971).

In seeking an answer to that fact-sensitive question, "I see no test-related substitute for the exercise of legal judgment." *Van Orden* v. *Perry*, 545 U. S. 677, 700 (2005)

(BREYER, J., concurring in judgment).  Having applied my legal judgment to the relevant facts, I conclude, like JUSTICE KAGAN, that the town of Greece failed to make reasonable efforts to include prayer givers of minority faiths, with the result that, although it is a community of several faiths, its prayer givers were almost exclusively persons of a single faith.  Under these circumstances, I would affirm the judgment of the Court of Appeals that Greece's prayer practice violated the Establishment Clause.

I dissent from the Court's decision to the contrary.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–696

_____

## TOWN OF GREECE, NEW YORK, PETITIONER *v.* SUSAN GALLOWAY ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[May 5, 2014]

JUSTICE KAGAN, with whom JUSTICE GINSBURG, JUS-
TICE BREYER, and JUSTICE SOTOMAYOR join, dissenting.

For centuries now, people have come to this country
from every corner of the world to share in the blessing of
religious freedom. Our Constitution promises that they
may worship in their own way, without fear of penalty or
danger, and that in itself is a momentous offering. Yet our
Constitution makes a commitment still more remarkable—
that however those individuals worship, they will count
as full and equal American citizens. A Christian, a Jew,
a Muslim (and so forth)—each stands in the same re-
lationship with her country, with her state and local
communities, and with every level and body of govern-
ment. So that when each person performs the duties or
seeks the benefits of citizenship, she does so not as an
adherent to one or another religion, but simply as an
American.

I respectfully dissent from the Court's opinion because I
think the Town of Greece's prayer practices violate that
norm of religious equality—the breathtakingly generous
constitutional idea that our public institutions belong no
less to the Buddhist or Hindu than to the Methodist or
Episcopalian. I do not contend that principle translates
here into a bright separationist line. To the contrary, I

agree with the Court's decision in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), upholding the Nebraska Legislature's tradition of beginning each session with a chaplain's prayer. And I believe that pluralism and inclusion in a town hall can satisfy the constitutional requirement of neutrality; such a forum need not become a religion-free zone. But still, the Town of Greece should lose this case. The practice at issue here differs from the one sustained in *Marsh* because Greece's town meetings involve participation by ordinary citizens, and the invocations given—directly to those citizens—were predominantly sectarian in content. Still more, Greece's Board did nothing to recognize religious diversity: In arranging for clergy members to open each meeting, the Town never sought (except briefly when this suit was filed) to involve, accommodate, or in any way reach out to adherents of non-Christian religions. So month in and month out for over a decade, prayers steeped in only one faith, addressed toward members of the public, commenced meetings to discuss local affairs and distribute government benefits. In my view, that practice does not square with the First Amendment's promise that every citizen, irrespective of her religion, owns an equal share in her government.

I

To begin to see what has gone wrong in the Town of Greece, consider several hypothetical scenarios in which sectarian prayer—taken straight from this case's record— infuses governmental activities. None involves, as this case does, a proceeding that could be characterized as a legislative session, but they are useful to elaborate some general principles. In each instance, assume (as was true in Greece) that the invocation is given pursuant to government policy and is representative of the prayers generally offered in the designated setting:

- You are a party in a case going to trial; let's say you have filed suit against the government for violating one of your legal rights. The judge bangs his gavel to call the court to order, asks a minister to come to the front of the room, and instructs the 10 or so individuals present to rise for an opening prayer. The clergyman faces those in attendance and says: "Lord, God of all creation, . . . . We acknowledge the saving sacrifice of Jesus Christ on the cross. We draw strength . . . from his resurrection at Easter. Jesus Christ, who took away the sins of the world, destroyed our death, through his dying and in his rising, he has restored our life. Blessed are you, who has raised up the Lord Jesus, you who will raise us, in our turn, and put us by His side. . . . Amen." App. 88a–89a. The judge then asks your lawyer to begin the trial.

- It's election day, and you head over to your local polling place to vote. As you and others wait to give your names and receive your ballots, an election official asks everyone there to join him in prayer. He says: "We pray this [day] for the guidance of the Holy Spirit as [we vote] . . . . Let's just say the Our Father together. 'Our Father, who art in Heaven, hallowed be thy name; thy Kingdom come, thy will be done, on earth as it is in Heaven. . . .'" *Id.*, at 56a. And after he concludes, he makes the sign of the cross, and appears to wait expectantly for you and the other prospective voters to do so too.

- You are an immigrant attending a naturalization ceremony to finally become a citizen. The presiding official tells you and your fellow applicants that before administering the oath of allegiance, he would

> like a minister to pray for you and with you. The
> pastor steps to the front of the room, asks everyone
> to bow their heads, and recites: "[F]ather, son, and
> Holy Spirit—it is with a due sense of reverence and
> awe that we come before you [today] seeking your
> blessing . . . . You are . . . a wise God, oh Lord, . . .
> as evidenced even in the plan of redemption that is
> fulfilled in Jesus Christ. We ask that you would
> give freely and abundantly wisdom to one and to
> all. . . in the name of the Lord and Savior Jesus
> Christ, who lives with you and the Holy Spirit, one
> God for ever and ever. Amen." *Id.*, at 99a–100a.

I would hold that the government officials responsible for
the above practices—that is, for prayer repeatedly invok-
ing a single religion's beliefs in these settings—crossed a
constitutional line. I have every confidence the Court
would agree. See *ante*, at 13 (ALITO, J., concurring). And
even Greece's attorney conceded that something like the
first hypothetical (he was not asked about the others)
would violate the First Amendment. See Tr. of Oral Arg.
3–4. Why?

The reason, of course, has nothing to do with Christian-
ity as such. This opinion is full of Christian prayers, be-
cause those were the only invocations offered in the Town
of Greece. But if my hypotheticals involved the prayer of
some other religion, the outcome would be exactly the
same. Suppose, for example, that government officials in
a predominantly Jewish community asked a rabbi to begin
all public functions with a chanting of the Sh'ma and
V'ahavta. ("Hear O Israel! The Lord our God, the Lord is
One. . . . Bind [these words] as a sign upon your hand; let
them be a symbol before your eyes; inscribe them on the
doorposts of your house, and on your gates.") Or assume
officials in a mostly Muslim town requested a muezzin to
commence such functions, over and over again, with a

recitation of the Adhan. ("God is greatest, God is greatest. I bear witness that there is no deity but God. I bear witness that Muhammed is the Messenger of God.") In any instance, the question would be why such government-sponsored prayer of a single religion goes beyond the constitutional pale.

One glaring problem is that the government in all these hypotheticals has aligned itself with, and placed its imprimatur on, a particular religious creed. "The clearest command of the Establishment Clause," this Court has held, "is that one religious denomination cannot be officially preferred over another." *Larson* v. *Valente*, 456 U. S. 228, 244 (1982). Justices have often differed about a further issue: whether and how the Clause applies to governmental policies favoring religion (of all kinds) over non-religion. Compare, *e.g.*, *McCreary County* v. *American Civil Liberties Union of Ky.*, 545 U. S. 844, 860 (2005) ("[T]he First Amendment mandates governmental neutrality between . . . religion and nonreligion"), with, *e.g.*, *id.*, at 885 (SCALIA, J., dissenting) ("[T]he Court's oft repeated assertion that the government cannot favor religious practice [generally] is false"). But no one has disagreed with this much:

> "[O]ur constitutional tradition, from the Declaration of Independence and the first inaugural address of Washington . . . down to the present day, has . . . ruled out of order government-sponsored endorsement of religion . . . where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ)." *Lee* v. *Weisman*, 505 U. S. 577, 641 (1992) (SCALIA, J., dissenting).

See also *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 605

(1989) ("Whatever else the Establishment Clause may mean[,] . . . [it] means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)").[1]    By authorizing and overseeing prayers associated with a single religion—to the exclusion of all others—the government officials in my hypothetical cases (whether federal, state, or local does not matter) have violated that foundational principle.  They have embarked on a course of religious favoritism anathema to the First Amendment.

  And making matters still worse: They have done so in a place where individuals come to interact with, and partici-

————————

  [1] That principle meant as much to the founders as it does today. The demand for neutrality among religions is not a product of 21st century "political correctness," but of the 18th century view—rendered no less wise by time—that, in George Washington's words, "[r]eligious controversies are always productive of more acrimony and irreconcilable hatreds than those which spring from any other cause."  Letter to Edward Newenham (June 22, 1792), in 10 Papers of George Washington: Presidential Series 493 (R. Haggard & M. Mastromarino eds. 2002) (hereinafter PGW).  In an age when almost no one in this country was not a Christian of one kind or another, Washington consistently declined to use language or imagery associated only with that religion. See Brief for Paul Finkelman et al. as *Amici Curiae* 15–19 (noting, for example, that in revising his first inaugural address, Washington deleted the phrase "the blessed Religion revealed in the word of God" because it was understood to denote only Christianity).    Thomas Jefferson, who followed the same practice throughout his life, explained that he omitted any reference to Jesus Christ in Virginia's Bill for Establishing Religious Freedom (a precursor to the Establishment Clause) in order "to comprehend, within the mantle of [the law's] protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and infidel of every denomination."  1 Writings of Thomas Jefferson 62 (P. Ford ed. 1892).  And James Madison, who again used only nonsectarian language in his writings and addresses, warned that religious proclamations might, "if not strictly guarded," express only "the creed of the majority and a single sect."  Madison's "Detached Memoranda," 3 Wm. & Mary Quarterly 534, 561 (1946).

pate in, the institutions and processes of their govern-
ment. A person goes to court, to the polls, to a naturaliza-
tion ceremony—and a government official or his hand-
picked minister asks her, as the first order of official
business, to stand and pray with others in a way conflict-
ing with her own religious beliefs. Perhaps she feels suffi-
cient pressure to go along—to rise, bow her head, and join
in whatever others are saying: After all, she wants,
very badly, what the judge or poll worker or immigration
official has to offer. Or perhaps she is made of stronger
mettle, and she opts not to participate in what she does not
believe—indeed, what would, for her, be something like
blasphemy. She then must make known her dissent from
the common religious view, and place herself apart from
other citizens, as well as from the officials responsible for
the invocations. And so a civic function of some kind
brings religious differences to the fore: That public pro-
ceeding becomes (whether intentionally or not) an instru-
ment for dividing her from adherents to the community's
majority religion, and for altering the very nature of her
relationship with her government.

That is not the country we are, because that is not what
our Constitution permits. Here, when a citizen stands
before her government, whether to perform a service or
request a benefit, her religious beliefs do not enter into the
picture. See Thomas Jefferson, Virginia Act for Establish-
ing Religious Freedom (Oct. 31, 1785), in 5 The Founders'
Constitution 85 (P. Kurland & R. Lerner eds. 1987)
("[O]pinion[s] in matters of religion . . . shall in no wise
diminish, enlarge, or affect [our] civil capacities"). The
government she faces favors no particular religion, either
by word or by deed. And that government, in its various
processes and proceedings, imposes no religious tests on
its citizens, sorts none of them by faith, and permits no
exclusion based on belief. When a person goes to court, a
polling place, or an immigration proceeding—I could go on:

to a zoning agency, a parole board hearing, or the DMV—
government officials do not engage in sectarian worship,
nor do they ask her to do likewise. They all participate in
the business of government not as Christians, Jews, Mus-
lims (and more), but only as Americans—none of them
different from any other for that civic purpose. Why not,
then, at a town meeting?

## II

In both Greece's and the majority's view, everything I
have discussed is irrelevant here because this case in-
volves "the tradition of legislative prayer outlined" in
*Marsh* v. *Chambers*, 463 U. S. 783. *Ante*, at 10. And
before I dispute the Town and Court, I want to give them
their due: They are right that, under *Marsh*, legislative
prayer has a distinctive constitutional warrant by virtue of
tradition. As the Court today describes, a long history,
stretching back to the first session of Congress (when
chaplains began to give prayers in both Chambers), "ha[s]
shown that prayer in this limited context could 'coexis[t]
with the principles of disestablishment and religious
freedom.'" *Ante*, at 10 (quoting *Marsh*, 463 U. S., at 786).
Relying on that "unbroken" national tradition, *Marsh*
upheld (I think correctly) the Nebraska Legislature's
practice of opening each day with a chaplain's prayer as "a
tolerable acknowledgment of beliefs widely held among
the people of this country." *Id.*, at 792. And so I agree
with the majority that the issue here is "whether the
prayer practice in the Town of Greece fits within the tradi-
tion long followed in Congress and the state legislatures."
*Ante*, at 9.

Where I depart from the majority is in my reply to that
question. The town hall here is a kind of hybrid. Greece's
Board indeed has legislative functions, as Congress and
state assemblies do—and that means some opening pray-
ers are allowed there. But much as in my hypotheticals,

the Board's meetings are also occasions for ordinary citizens to engage with and petition their government, often on highly individualized matters. That feature calls for Board members to exercise special care to ensure that the prayers offered are inclusive—that they respect each and every member of the community as an equal citizen.[2] But the Board, and the clergy members it selected, made no such effort. Instead, the prayers given in Greece, addressed directly to the Town's citizenry, were *more* sectarian, and *less* inclusive, than anything this Court sustained in *Marsh*. For those reasons, the prayer in Greece departs from the legislative tradition that the majority takes as its benchmark.

## A

Start by comparing two pictures, drawn precisely from reality. The first is of Nebraska's (unicameral) Legislature, as this Court and the state senators themselves described it. The second is of town council meetings in Greece, as revealed in this case's record.

It is morning in Nebraska, and senators are beginning to gather in the State's legislative chamber: It is the beginning of the official workday, although senators may not yet need to be on the floor. See *Chambers* v. *Marsh*, 504 F. Supp. 585, 590, and n. 12 (D. Neb. 1980); *Lee*, 505 U. S., at 597. The chaplain rises to give the daily invocation. That prayer, as the senators emphasized when their case came to this Court, is "directed only at the legislative

―――――――――

[2] Because JUSTICE ALITO questions this point, it bears repeating. I do not remotely contend that "prayer is not allowed" at participatory meetings of "local government legislative bodies"; nor is that the "logical thrust" of any argument I make. *Ante*, at 7–8. Rather, what I say throughout this opinion is that in this citizen-centered venue, government officials must take steps to ensure—as none of Greece's Board members ever did—that opening prayers are inclusive of different faiths, rather than always identified with a single religion.

membership, not at the public at large." Brief for Petitioners in *Marsh* 30. Any members of the public who happen to be in attendance—not very many at this early hour—watch only from the upstairs visitors' gallery. See App. 72 in *Marsh* (senator's testimony that "as a practical matter the public usually is not there" during the prayer).

The longtime chaplain says something like the following (the excerpt is from his own *amicus* brief supporting Greece in this case): "*O God*, who has given all persons talents and varying capacities, Thou dost only require of us that we utilize Thy gifts to a maximum. In this Legislature to which Thou has entrusted special abilities and opportunities, may each recognize his stewardship for the people of the State." Brief for Robert E. Palmer 9. The chaplain is a Presbyterian minister, and "some of his earlier prayers" explicitly invoked Christian beliefs, but he "removed all references to Christ" after a single legislator complained. *Marsh*, 463 U. S., at 793, n. 14; Brief for Petitioners in *Marsh* 12. The chaplain also previously invited other clergy members to give the invocation, including local rabbis. See *ibid.*

Now change the channel: It is evening in Greece, New York, and the Supervisor of the Town Board calls its monthly public meeting to order. Those meetings (so says the Board itself) are "the most important part of Town government." See Town of Greece, Town Board, online at http://greeceny.gov/planning/townboard (as visited May 2, 2014 and available in Clerk of Court's case file). They serve assorted functions, almost all actively involving members of the public. The Board may swear in new Town employees and hand out awards for civic accomplishments; it always provides an opportunity (called a Public Forum) for citizens to address local issues and ask for improved services or new policies (for example, better accommodations for the disabled or actions to ameliorate traffic congestion, see Pl. Exhs. 718, 755, in No. 6:08–cv–

6088 (WDNY)); and it usually hears debate on individual applications from residents and local businesses to obtain special land-use permits, zoning variances, or other licenses.

The Town Supervisor, Town Clerk, Chief of Police, and four Board members sit at the front of the meeting room on a raised dais. But the setting is intimate: There are likely to be only 10 or so citizens in attendance. A few may be children or teenagers, present to receive an award or fulfill a high school civics requirement.

As the first order of business, the Town Supervisor introduces a local Christian clergy member—denominated the chaplain of the month—to lead the assembled persons in prayer. The pastor steps up to a lectern (emblazoned with the Town's seal) at the front of the dais, and with his back to the Town officials, he faces the citizens present. He asks them all to stand and to "pray as we begin this evening's town meeting." App. 134a. (He does not suggest that anyone should feel free not to participate.) And he says:

> "The beauties of spring . . . are an expressive symbol of the new life of the risen Christ. The Holy Spirit was sent to the apostles at Pentecost so that they would be courageous witnesses of the Good News to different regions of the Mediterranean world and beyond. The Holy Spirit continues to be the inspiration and the source of strength and virtue, which we all need in the world of today. And so . . . [w]e pray this evening for the guidance of the Holy Spirit as the Greece Town Board meets." *Ibid.*

After the pastor concludes, Town officials behind him make the sign of the cross, as do some members of the audience, and everyone says "Amen." See 681 F. 3d 20, 24 (CA2 2012). The Supervisor then announces the start of the Public Forum, and a citizen stands up to complain

about the Town's contract with a cable company. See App. in No. 10–3635 (CA2), p. A574.

## B

Let's count the ways in which these pictures diverge. First, the governmental proceedings at which the prayers occur differ significantly in nature and purpose. The Nebraska Legislature's floor sessions—like those of the U. S. Congress and other state assemblies—are of, by, and for elected lawmakers. Members of the public take no part in those proceedings; any few who attend are spectators only, watching from a high-up visitors' gallery. (In that respect, note that neither the Nebraska Legislature nor the Congress calls for prayer when citizens themselves participate in a hearing—say, by giving testimony relevant to a bill or nomination.) Greece's town meetings, by contrast, revolve around ordinary members of the community. Each and every aspect of those sessions provides opportunities for Town residents to interact with public officials. And the most important parts enable those citizens to petition their government. In the Public Forum, they urge (or oppose) changes in the Board's policies and priorities; and then, in what are essentially adjudicatory hearings, they request the Board to grant (or deny) applications for various permits, licenses, and zoning variances. So the meetings, both by design and in operation, allow citizens to actively participate in the Town's governance—sharing concerns, airing grievances, and both shaping the community's policies and seeking their benefits.

Second (and following from what I just said), the prayers in these two settings have different audiences. In the Nebraska Legislature, the chaplain spoke to, and only to, the elected representatives. Nebraska's senators were adamant on that point in briefing *Marsh*, and the facts fully supported them: As the senators stated, "[t]he activ-

ity is a matter of internal daily procedure directed only at the legislative membership, not at [members of] the public." Brief for Petitioners in *Marsh* 30; see Reply Brief for Petitioners in *Marsh* 8 ("The [prayer] practice involves no function or power of government vis-à-vis the Nebraska citizenry, but merely concerns an internal decision of the Nebraska Legislature as to the daily procedure by which it conducts its own affairs"). The same is true in the U. S. Congress and, I suspect, in every other state legislature. See Brief for Members of Congress as *Amici Curiae* 6 ("Consistent with the fact that attending citizens are mere passive observers, prayers in the House are delivered for the Representatives themselves, not those citizens"). As several Justices later noted (and the majority today agrees, see *ante*, at 19–20),[3] *Marsh* involved "government officials invok[ing] spiritual inspiration entirely for their own benefit without directing any religious message at the citizens they lead." *Lee*, 505 U. S., at 630, n. 8 (Souter, J., concurring).

The very opposite is true in Greece: Contrary to the majority's characterization, see *ante*, at 19–20, the prayers there are directed squarely at the citizens. Remember that the chaplain of the month stands with his back to the Town Board; his real audience is the group he is facing— the 10 or so members of the public, perhaps including children. See *supra*, at 10. And he typically addresses those people, as even the majority observes, as though he is "directing [his] congregation." *Ante*, at 21. He almost always begins with some version of "Let us all pray together." See, *e.g.*, App. 75a, 93a, 106a, 109a. Often, he calls on everyone to stand and bow their heads, and he

---

[3] For ease of reference and to avoid confusion, I refer to JUSTICE KENNEDY's opinion as "the majority." But the language I cite that appears in Part II–B of that opinion is, in fact, only attributable to a plurality of the Court.

may ask them to recite a common prayer with him. See, *e.g.*, *id.*, at 28a, 42a, 43a, 56a, 77a. He refers, constantly, to a collective "we"—to "our" savior, for example, to the presence of the Holy Spirit in "our" lives, or to "our brother the Lord Jesus Christ." See, *e.g.*, *id.*, at 32a, 45a, 47a, 69a, 71a. In essence, the chaplain leads, as the first part of a town meeting, a highly intimate (albeit relatively brief) prayer service, with the public serving as his congregation.

And third, the prayers themselves differ in their content and character. *Marsh* characterized the prayers in the Nebraska Legislature as "in the Judeo-Christian tradition," and stated, as a relevant (even if not dispositive) part of its analysis, that the chaplain had removed all explicitly Christian references at a senator's request. 463 U. S., at 793, n. 14. And as the majority acknowledges, see *ante*, at 12, *Marsh* hinged on the view that "that the prayer opportunity ha[d] [not] been exploited to proselytize or advance any one . . . faith or belief"; had it been otherwise, the Court would have reached a different decision. 463 U. S., at 794–795.

But no one can fairly read the prayers from Greece's Town meetings as anything other than explicitly Christian—constantly and exclusively so. From the time Greece established its prayer practice in 1999 until litigation loomed nine years later, all of its monthly chaplains were Christian clergy. And after a brief spell surrounding the filing of this suit (when a Jewish layman, a Wiccan priestess, and a Baha'i minister appeared at meetings), the Town resumed its practice of inviting only clergy from neighboring Protestant and Catholic churches. See App. 129a–143a. About two-thirds of the prayers given over this decade or so invoked "Jesus," "Christ," "Your Son," or "the Holy Spirit"; in the 18 months before the record closed, 85% included those references. See generally *id.,* at 27a–143a. Many prayers contained elaborations of Christian doctrine or recitations of scripture. See, *e.g.*, *id.*,

at 129a ("And in the life and death, resurrection and ascension of the Savior Jesus Christ, the full extent of your kindness shown to the unworthy is forever demonstrated"); *id.*, at 94a ("For unto us a child is born; unto us a son is given. And the government shall be upon his shoulder . . ."). And the prayers usually close with phrases like "in the name of Jesus Christ" or "in the name of Your son." See, *e.g.*, *id.*, at 55a, 65a, 73a, 85a.

Still more, the prayers betray no understanding that the American community is today, as it long has been, a rich mosaic of religious faiths. See *Braunfeld* v. *Brown*, 366 U. S. 599, 606 (1961) (plurality opinion) (recognizing even half a century ago that "we are a cosmopolitan nation made up of people of almost every conceivable religious preference"). The monthly chaplains appear almost always to assume that everyone in the room is Christian (and of a kind who has no objection to government-sponsored worship[4]). The Town itself has never urged its chaplains to reach out to members of other faiths, or even to recall that they might be present. And accordingly, few chaplains have made any effort to be inclusive; none has thought even to assure attending members of the public that they need not participate in the prayer session. Indeed, as the majority forthrightly recognizes, see *ante*, at 17, when the plaintiffs here began to voice concern over prayers that excluded some Town residents, one pastor pointedly thanked the Board "[o]n behalf of all God-fearing people" for holding fast, and another declared the objectors "in the minority and . . . ignorant of the history of our country." App. 137a, 108a.

———————

[4] Leaders of several Baptist and other Christian congregations have explained to the Court that "many Christians believe . . . that their freedom of conscience is violated when they are pressured to participate in government prayer, because such acts of worship should only be performed voluntarily." Brief for Baptist Joint Committee for Religious Liberty et al. as *Amici Curiae* 18.

C

Those three differences, taken together, remove this case from the protective ambit of *Marsh* and the history on which it relied. To recap: *Marsh* upheld prayer addressed to legislators alone, in a proceeding in which citizens had no role—and even then, only when it did not "proselytize or advance" any single religion. 463 U. S., at 794. It was that legislative prayer practice (not every prayer in a body exercising any legislative function) that the Court found constitutional given its "unambiguous and unbroken history." *Id.*, at 792. But that approved practice, as I have shown, is not Greece's. None of the history *Marsh* cited— and none the majority details today—supports calling on citizens to pray, in a manner consonant with only a single religion's beliefs, at a participatory public proceeding, having both legislative and adjudicative components. Or to use the majority's phrase, no "history shows that th[is] specific practice is permitted." *Ante*, at 8. And so, contra the majority, Greece's prayers cannot simply ride on the constitutional coattails of the legislative tradition *Marsh* described. The Board's practice must, in its own particulars, meet constitutional requirements.

And the guideposts for addressing that inquiry include the principles of religious neutrality I discussed earlier. See *supra*, at 4–8. The government (whether federal, state, or local) may not favor, or align itself with, any particular creed. And that is nowhere more true than when officials and citizens come face to face in their shared institutions of governance. In performing civic functions and seeking civic benefits, each person of this nation must experience a government that belongs to one and all, irrespective of belief. And for its part, each government must ensure that its participatory processes will not classify those citizens by faith, or make relevant their religious differences.

To decide how Greece fares on that score, think again

about how its prayer practice works, meeting after meeting. The case, I think, has a fair bit in common with my earlier hypotheticals. See *supra*, at 2–4, 7. Let's say that a Muslim citizen of Greece goes before the Board to share her views on policy or request some permit. Maybe she wants the Board to put up a traffic light at a dangerous intersection; or maybe she needs a zoning variance to build an addition on her home. But just before she gets to say her piece, a minister deputized by the Town asks her to pray "in the name of God's only son Jesus Christ." App. 99a. She must think—it is hardly paranoia, but only the truth—that Christian worship has become entwined with local governance. And now she faces a choice—to pray alongside the majority as one of that group or somehow to register her deeply felt difference. She is a strong person, but that is no easy call—especially given that the room is small and her every action (or inaction) will be noticed. She does not wish to be rude to her neighbors, nor does she wish to aggravate the Board members whom she will soon be trying to persuade. And yet she does not want to acknowledge Christ's divinity, any more than many of her neighbors would want to deny that tenet. So assume she declines to participate with the others in the first act of the meeting—or even, as the majority proposes, that she stands up and leaves the room altogether, see *ante*, at 21. At the least, she becomes a different kind of citizen, one who will not join in the religious practice that the Town Board has chosen as reflecting its own and the community's most cherished beliefs. And she thus stands at a remove, based solely on religion, from her fellow citizens and her elected representatives.

Everything about that situation, I think, infringes the First Amendment. (And of course, as I noted earlier, it would do so no less if the Town's clergy always used the liturgy of some other religion. See *supra,* at 4–5.) That the Town Board selects, month after month and year after

year, prayergivers who will reliably speak in the voice of Christianity, and so places itself behind a single creed. That in offering those sectarian prayers, the Board's chosen clergy members repeatedly call on individuals, prior to participating in local governance, to join in a form of worship that may be at odds with their own beliefs. That the clergy thus put some residents to the unenviable choice of either pretending to pray like the majority or declining to join its communal activity, at the very moment of petitioning their elected leaders. That the practice thus divides the citizenry, creating one class that shares the Board's own evident religious beliefs and another (far smaller) class that does not. And that the practice also alters a dissenting citizen's relationship with her government, making her religious difference salient when she seeks only to engage her elected representatives as would any other citizen.

None of this means that Greece's town hall must be religion- or prayer-free. "[W]e are a religious people," *Marsh* observed, 463 U. S., at 792, and prayer draws some warrant from tradition in a town hall, as well as in Congress or a state legislature, see *supra*, at 8–9. What the circumstances here demand is the recognition that we are a pluralistic people too. When citizens of all faiths come to speak to each other and their elected representatives in a legislative session, the government must take especial care to ensure that the prayers they hear will seek to include, rather than serve to divide. No more is required—but that much is crucial—to treat every citizen, of whatever religion, as an equal participant in her government.

And contrary to the majority's (and JUSTICE ALITO's) view, see *ante*, at 13–14; *ante*, at 4–7, that is not difficult to do. If the Town Board had let its chaplains know that they should speak in nonsectarian terms, common to diverse religious groups, then no one would have valid

grounds for complaint. See *Joyner* v. *Forsyth County*, 653 F. 3d 341, 347 (CA4 2011) (Wilkinson, J.) (Such prayers show that "those of different creeds are in the end kindred spirits, united by a respect paid higher providence and by a belief in the importance of religious faith"). Priests and ministers, rabbis and imams give such invocations all the time; there is no great mystery to the project. (And providing that guidance would hardly have caused the Board to run afoul of the idea that "[t]he First Amendment is not a majority rule," as the Court (headspinningly) suggests, *ante*, at 14; what does that is the Board's *refusal* to reach out to members of minority religious groups.) Or if the Board preferred, it might have invited clergy of many faiths to serve as chaplains, as the majority notes that Congress does. See *ante*, at 10–11. When one month a clergy member refers to Jesus, and the next to Allah or Jehovah—as the majority hopefully though counterfactually suggests happened here, see *ante*, at 10–11, 15—the government does not identify itself with one religion or align itself with that faith's citizens, and the effect of even sectarian prayer is transformed. So Greece had multiple ways of incorporating prayer into its town meetings— reflecting all the ways that prayer (as most of us know from daily life) can forge common bonds, rather than divide. See also *ante,* at 4 (BREYER, J., dissenting).

But Greece could not do what it did: infuse a participatory government body with one (and only one) faith, so that month in and month out, the citizens appearing before it become partly defined by their creed—as those who share, and those who do not, the community's majority religious belief. In this country, when citizens go before the government, they go not as Christians or Muslims or Jews (or what have you), but just as Americans (or here, as Grecians). That is what it means to be an equal citizen, irrespective of religion. And that is what the Town of Greece precluded by so identifying itself with a single

faith.

### III

How, then, does the majority go so far astray, allowing the Town of Greece to turn its assemblies for citizens into a forum for Christian prayer? The answer does not lie in first principles: I have no doubt that every member of this Court believes as firmly as I that our institutions of government belong equally to all, regardless of faith. Rather, the error reflects two kinds of blindness. First, the majority misapprehends the facts of this case, as distinct from those characterizing traditional legislative prayer. And second, the majority misjudges the essential meaning of the religious worship in Greece's town hall, along with its capacity to exclude and divide.

The facts here matter to the constitutional issue; indeed, the majority itself acknowledges that the requisite inquiry—a "fact-sensitive" one—turns on "the setting in which the prayer arises and the audience to whom it is directed." *Ante*, at 19. But then the majority glides right over those considerations—at least as they relate to the Town of Greece. When the majority analyzes the "setting" and "audience" for prayer, it focuses almost exclusively on Congress and the Nebraska Legislature, see *ante*, at 6–8, 10–11, 15–16, 19–20; it does not stop to analyze how far those factors differ in Greece's meetings. The majority thus gives short shrift to the gap—more like, the chasm— between a legislative floor session involving only elected officials and a town hall revolving around ordinary citizens. And similarly the majority neglects to consider how the prayers in Greece are mostly addressed to members of the public, rather than (as in the forums it discusses) to the lawmakers. "The District Court in *Marsh*," the majority expounds, "described the prayer exercise as 'an internal act' directed at the Nebraska Legislature's 'own members.'" *Ante*, at 19 (quoting *Chambers* v. *Marsh*, 504

F. Supp., at 588); see *ante*, at 20 (similarly noting that Nebraska senators "invoke[d] spiritual inspiration entirely for their own benefit" and that prayer in Congress is "religious worship for national representatives" only).  Well, yes, so it is in Lincoln, and on Capitol Hill.  But not in Greece, where as I have described, the chaplain faces the Town's residents—with the Board watching from on high—and calls on them to pray together.  See *supra,* at 10, 12.

And of course—as the majority sidesteps as well—to pray in the name of Jesus Christ.  In addressing the sectarian content of these prayers, the majority again changes the subject, preferring to explain what happens in *other* government bodies.  The majority notes, for example, that Congress "welcom[es] ministers of many creeds," who commonly speak of "values that count as universal," *ante*, at 11, 15; and in that context, the majority opines, the fact "[t]hat a prayer is given in the name of Jesus, Allah, or Jehovah . . . does not remove it from" *Marsh*'s protection, see *ante*, at 15.  But that case is not this one, as I have shown, because in Greece only Christian clergy members speak, and then mostly in the voice of their own religion; no Allah or Jehovah ever is mentioned.  See *supra,* at 13– 14.  So all the majority can point to in the Town's practice is that the Board "maintains a policy of nondiscrimination," and "represent[s] that it would welcome a prayer by any minister or layman who wishe[s] to give one." *Ante*, at 17–18.  But that representation has never been publicized; nor has the Board (except for a few months surrounding this suit's filing) offered the chaplain's role to any non-Christian clergy or layman, in either Greece or its environs; nor has the Board ever provided its chaplains with guidance about reaching out to members of other faiths, as most state legislatures and Congress do.  See 732 F. Supp. 2d 195, 197–203 (WDNY 2010); National Conference of State Legislatures, Inside the Legislative Process: Prayer

Practices 5–145, 5–146 (2002); *ante*, at 5 (BREYER, J., dissenting).  The majority thus errs in assimilating the Board's prayer practice to that of Congress or the Nebraska Legislature.  Unlike those models, the Board is determinedly—and relentlessly—noninclusive.[5]

And the month in, month out sectarianism the Board chose for its meetings belies the majority's refrain that the prayers in Greece were "ceremonial" in nature.  *Ante*, at 16, 19, 21, 23.  Ceremonial references to the divine surely abound: The majority is right that "the Pledge of Allegiance, inaugural prayer, or the recitation of 'God save the United States and this honorable Court'" each fits the bill. *Ante*, at 19.  But prayers evoking "the saving sacrifice of Jesus Christ on the cross," "the plan of redemption that is fulfilled in Jesus Christ," "the life and death, resurrection and ascension of the Savior Jesus Christ," the workings of the Holy Spirit, the events of Pentecost, and the belief that God "has raised up the Lord Jesus" and "will raise us, in our turn, and put us by His side"?  See App. 56a, 88a–89a, 99a, 123a, 129a, 134a.  No.  These are statements of profound belief and deep meaning, subscribed to by many, denied by some.  They "speak of the depths of [one's] life, of the source of [one's] being, of [one's] ultimate concern, of what [one] take[s] seriously without any reservation."  P.

---

[5] JUSTICE ALITO similarly falters in attempting to excuse the Town Board's constant sectarianism.  His concurring opinion takes great pains to show that the problem arose from a sort of bureaucratic glitch: The Town's clerks, he writes, merely "did a bad job in compiling the list" of chaplains.  *Ante,* at 6; see *ante*, at 1–3.  Now I suppose one question that account raises is why in over a decade, no member of the Board noticed that the clerk's list was producing prayers of only one kind.  But put that aside.  Honest oversight or not, the problem remains: Every month for more than a decade, the Board aligned itself, through its prayer practices, with a single religion.  That the concurring opinion thinks my objection to that is "really quite niggling," *ante*, at 4, says all there is to say about the difference between our respective views.

Tillich, The Shaking of the Foundations 57 (1948). If they (and the central tenets of other religions) ever become mere ceremony, this country will be a fundamentally different—and, I think, poorer—place to live.

But just for that reason, the not-so-implicit message of the majority's opinion—"What's the big deal, anyway?"—is mistaken. The content of Greece's prayers *is* a big deal, to Christians and non-Christians alike. A person's response to the doctrine, language, and imagery contained in those invocations reveals a core aspect of identity—who that person is and how she faces the world. And the responses of different individuals, in Greece and across this country, of course vary. Contrary to the majority's apparent view, such sectarian prayers are not "part of our expressive idiom" or "part of our heritage and tradition," assuming the word "our" refers to all Americans. *Ante*, at 19. They express beliefs that are fundamental to some, foreign to others—and because that is so they carry the ever-present potential to both exclude and divide. The majority, I think, assesses too lightly the significance of these religious differences, and so fears too little the "religiously based divisiveness that the Establishment Clause seeks to avoid." *Van Orden* v. *Perry*, 545 U. S. 677, 704 (2005) (BREYER, J., concurring in judgment). I would treat more seriously the multiplicity of Americans' religious commitments, along with the challenge they can pose to the project—the distinctively American project—of creating one from the many, and governing all as united.

## IV

In 1790, George Washington traveled to Newport, Rhode Island, a longtime bastion of religious liberty and the home of one of the first communities of American Jews. Among the citizens he met there was Moses Seixas, one of that congregation's lay officials. The ensuing exchange between the two conveys, as well as anything I know, the

promise this country makes to members of every religion.

Seixas wrote first, welcoming Washington to Newport. He spoke of "a deep sense of gratitude" for the new American Government—"a Government, which to bigotry gives no sanction, to persecution no assistance—but generously affording to All liberty of conscience, and immunities of Citizenship: deeming every one, of whatever Nation, tongue, or language, equal parts of the great governmental Machine." Address from Newport Hebrew Congregation (Aug. 17, 1790), in 6 PGW 286, n. 1 (M. Mastromarino ed. 1996). The first phrase there is the more poetic: a government that to "bigotry gives no sanction, to persecution no assistance." But the second is actually the more startling and transformative: a government that, beyond not aiding persecution, grants "immunities of citizenship" to the Christian and the Jew alike, and makes them "equal parts" of the whole country.

Washington responded the very next day. Like any successful politician, he appreciated a great line when he saw one—and knew to borrow it too. And so he repeated, word for word, Seixas's phrase about neither sanctioning bigotry nor assisting persecution. But he no less embraced the point Seixas had made about equality of citizenship. "It is now no more," Washington said, "that toleration is spoken of, as if it was by the indulgence of one class of people" to another, lesser one. For "[a]ll possess alike . . . immunities of citizenship." Letter to Newport Hebrew Congregation (Aug. 18, 1790), in 6 PGW 285. That is America's promise in the First Amendment: full and equal membership in the polity for members of every religious group, assuming only that they, like anyone "who live[s] under [the Government's] protection[,] should demean themselves as good citizens." *Ibid.*

For me, that remarkable guarantee means at least this much: When the citizens of this country approach their government, they do so only as Americans, not as mem-

bers of one faith or another. And that means that even in a partly legislative body, they should not confront government-sponsored worship that divides them along religious lines. I believe, for all the reasons I have given, that the Town of Greece betrayed that promise. I therefore respectfully dissent from the Court's decision.